[No. D044733. Fourth Dist., Div. One. June 9, 2005.]

TAWNYA D. RUIZ, as Personal Representative, etc., Plaintiff and Appellant,
v.
HERMAN WEISSKER, INC., Defendant and Respondent.

**COUNSEL**

Zalkin & Zimmer, Irwin M. Zalkin and Michael Zimmer for Plaintiff and Appellant.

Grimm Vranjes McCormick & Graham, Eugene P. Kenny and David E. Hallett for Defendant and Respondent.

**OPINION**

**McINTYRE, J.**—The fundamental question presented in this case is whether the California Supreme Court's analyses in *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] (*Privette*) and *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081] (*Hooker*), which hold that a hirer of a subcontractor whose employee is injured on the job as a result of the subcontractor's negligence is not vicariously liable under the peculiar risk doctrine for the employee's injuries, also bars similar claims against the hirer's agent. We conclude that the policy considerations relied on in *Privette* and *Hooker* are equally applicable to claims against the hirer's agent and thus affirm the judgment entered in favor of the agent.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2001, San Diego Gas & Electric Company (SDG&E) hired Herman Weissker, Inc. (HWI) as a contract administrator for its distribution line construction projects. Pursuant to its contract with SDG&E, HWI was responsible for reviewing plans to ensure proper planning and feasibility and for monitoring the construction work for safety and contract compliance.

In August 2002, SDG&E requested bids to replace old insulators on two of their 230kv transmission lines (also known as tie-lines) (TL 23002 and TL 23006, respectively) on a steel tower. Although both circuits on the tower had a history of "flashovers" (insulation failures that allowed electrical energy to flow from the lines to the tower structure), SDG&E limited the job to replacing only the insulators on TL 23002, so that TL 23006 could remain energized and in use during the project. Bidders were required to submit a work plan, including personnel safety methods, for SDG&E's consideration. SDG&E accepted a bid by Henkels & McCoy, Inc. (Henkels) to do the work.

In accordance with its master contract with SDG&E, Henkels was required to provide its own equipment for the job and to perform its work in accordance with applicable professional standards, including SDG&E's standards. The agreement also required that Henkels "take all necessary precautions for the safety of its employees . . . on the jobsite and prevent accidents or injury to individuals on, about, or adjacent to the jobsite" and fully comply with all laws, rules, regulations and standards relating to occupational health and safety. Henkels was "solely responsible for . . . construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work" and represented that it and its suppliers and agents were "properly licensed, fully experienced and qualified to perform the class and type of Work as specified . . . in addition to being properly insured, equipped, organized, staffed and financed to handle such Work."

Timothy Ruiz was a member of the Henkels crew that was assigned to do the replacement work. Prior to the commencement of the job, the crew met at the Henkels yard with Henkels foreman Don Snyder and HWI representative Donald Richards to discuss the equipment needed for the project. The project involved changing the insulators on TL 23002's three tiers of power lines, one on each of the lower, middle and upper portions of the tower. The 32-ton crane that the crew planned to use was unavailable, as was their second-choice lift, which had been red-tagged by a Henkels mechanic. Although Snyder initially indicated his intent to delay the start of the job, he changed his mind after talking with Richards and Henkels general foreman Bill Kibbe.

The Henkels crew ultimately decided to use a 95-foot bucket truck for the job; because the truck was not tall enough to reach the upper tier of the tower, the men also brought an insulated ladder so that they could reach the insulators on that tier. After the crew went to the jobsite, they explained to Richards their plans for carrying out the job, including the plan to use the ladder to reach the upper tier and their plans for protecting the men working on the tower by using personal grounding devices. Richards indicated that the crew's plans were fine with him.

After completing the work on the lower and middle phases of the circuit, the crew replaced the 95-foot bucket truck (which had started to leak hydraulic fluid) with an 85-foot bucket truck. At 2:20 p.m., the crew began the work on the top phase of the circuit. Because the 85-foot bucket truck was not tall enough to reach the top portion of the circuit, Ruiz climbed up to the top tier of the tower and secured the insulated ladder there. He and apprentice lineman Justin Fairbairn replaced the top phase insulators and, as Fairbairn was attempting to reposition the truck bucket to assist in getting Ruiz and the equipment down from the tower, Ruiz was electrocuted. (The evidence in the record does not clearly establish how the circuit became reenergized, but suggests several different possible causes.)

Fairbairn looked up and saw Ruiz hanging upside down with his legs caught in the ladder; he shouted at Ruiz, but got no response. Fairbairn climbed back onto the tower and began yelling to the crew to call 911 and help him get Ruiz down. Fairbairn gave Ruiz mouth-to-mouth resuscitation, periodically checking Ruiz's pulse, and continued to call for help for more than a half hour. Bystanders outside a nearby office heard Fairbairn's pleas and called 911 at 3:45 p.m. A bit later, Snyder and Henkels's superintendent Joe Malin came up in a bucket to assist in getting Ruiz down.

Paramedics arrived on the scene at 3:57 p.m., but, in accordance with fire department policies, could not assist with the rescue until the second circuit on the tower was deenergized. While the paramedics were waiting for SDG&E to shut off the power to TL 23006, Snyder and two other linemen succeeded in freeing Ruiz from the ladder and lowering him to the ground. At 4:45 p.m., paramedics took Ruiz by ambulance to the emergency room at Sharp Memorial Hospital; Ruiz died shortly thereafter. An autopsy showed that Ruiz suffered electrical burns on his right lower leg and right forearm and identified electrocution as the cause of death. The California Occupational Safety and Health Administration (Cal-OSHA) investigated the accident and cited Henkels for violating rules relating to personal grounding and approach distance practices and the adequacy of the tools used.

In March 2003, Ruiz's wife, personally and as the representative of Ruiz's estate (hereinafter collectively referred to as the Estate), filed this action against SDG&E and certain Does for negligence and wrongful death. The complaint alleged that Henkels's crew was unfamiliar with high voltage transmission line work, was inadequately trained and staffed to do such work and engaged in unsafe practices in carrying out the work. It further alleged that SDG&E and SDG&E's agents controlled the job and violated applicable rules, regulations and SDG&E's own safety standards by failing to (1) ensure that the crew discussed the risk of induction from working near a tie-line that remained energized; (2) verify that the crew was adequately trained in high voltage transmission line work; and (3) stop unsafe work practices (particularly inadequate grounding on the tower). The Estate also alleged that SDG&E and SDG&E's agents failed to undertake proper rescue measures after Ruiz was injured.

In July 2003, the Estate amended the complaint to name HWI as a Doe defendant. In April 2004, HWI brought a motion for summary judgment, arguing that under *Privette* and *Hooker*, the Estate's claims failed because the evidence showed that it did not control Henkels's work and that in any event its conduct did not affirmatively contribute to Ruiz's death, which it contended resulted from Ruiz's removal of his personal ground before he finished taking the ladder and other equipment down from the top tier of the tower.

The Estate opposed HWI's motion on numerous grounds. First, it argued that HWI was liable for Ruiz's death as SDG&E's agent because the SDG&E contract and policies required HWI to monitor the work to ensure jobsite safety. In support of this argument, the Estate submitted evidence of SDG&E's written standard practices, as well as evidence that HWI routinely employed former SDG&E employees (including Richards), maintained offices onsite at an SDG&E facility and used SDG&E's computers and communication equipment. It also submitted Fairbairn's declaration that because the crew's prior work related to distribution lines (having previously worked on only one 69kv transmission line on wood poles), the crew was relying on Richards's advice as to how to safely work the job. (The declaration did not indicate that this reliance was ever communicated to either HWI or SDG&E.)

Second, the Estate argued that under the Public Utilities Code and Public Utility Commission (PUC) regulations, SDG&E had a nondelegable duty to protect the safety of linemen working on its electrical system and that this duty extended to HWI. It submitted expert declarations indicating that SDG&E (1) violated industry standards and state law by failing to ensure that

the crew was qualified and had the proper equipment to do the work and that the crew used safe work procedures in doing the work; (2) permitted the work to continue under extremely hazardous conditions; (3) directly contributed to the risk of unnecessary electrocution by putting TL 23002 back in service while Ruiz and Fairbairn were still working on the tower, without notifying the crew or seeking the necessary clearance to do so; and (4) breached its duty to timely rescue Ruiz.

Finally, the Estate argued that because HWI did not hire Henkels to do the work, the analyses of *Privette* and *Hooker* were inapplicable and that, even if such analyses did apply to HWI, the evidence established triable issues of fact as to whether HWI's negligence in exercising its retained control over jobsite safety affirmatively contributed to Ruiz's death.

The superior court granted HWI's motion, finding that HWI's evidence showed that the company did not affirmatively contribute to Ruiz's death, that the Estate's evidence in opposition was insufficient to create a triable issue of fact in this regard and that HWI's failure to stop unsafe activities was insufficient to establish liability under *Hooker*. The court also found that the PUC's orders and rules were not specific enough to create nondelegable duties. It thereafter entered judgment in HWI's favor.

The Estate appeals from the resulting judgment, contending: (1) *Privette* and *Hooker* do not preclude its claims against HWI because HWI did not hire Henkels and thus HWI can be held vicariously liable for injuries resulting from Henkels's negligence; (2) SDG&E had a nondelegable duty to protect Ruiz's safety and HWI, as SDG&E's agent, is also liable for the breach of that duty notwithstanding *Privette* and *Hooker*; (3) even if *Privette* and *Hooker* apply, summary judgment was inappropriate because the evidence establishes triable issues of fact as to (A) whether HWI's exercise of retained control over Henkels's work affirmatively contributed to Ruiz's death and (B) whether HWI was negligent in failing to assist in rescue efforts.

## DISCUSSION

1. *Vicarious Liability Under the Peculiar Risk Doctrine*

At common law a person who hired an independent contractor was not liable to third parties for injuries caused by the contractor's negligent performance of the work. (*Privette, supra,* 5 Cal.4th at p. 693.) There were numerous exceptions to this general rule, including one known as the peculiar risk doctrine. (*Ibid.*) Under this doctrine, the person who hired an indepen-

dent contractor to perform inherently dangerous work could be held liable for tort damages when the contractor's negligent performance of the work caused injury to others. (*Id.* at p. 691.) The principal rationale for this exception to the general rule of nonliability was to ensure that an innocent bystander who was injured by a contractor's negligence would have a source of compensation even if the contractor was insolvent. (*Hooker, supra,* 27 Cal.4th at p. 204.) It was also based on the recognition that a hirer who was held vicariously liable to the injured claimant under the peculiar risk doctrine was entitled to seek equitable indemnity from the contractor whose negligence caused the injury, thus providing some assurance that the ultimate responsibility for the harm caused by the peculiar risk of the work would be borne by the person at fault for the injury. (*Privette, supra,* 5 Cal.4th at pp. 695 & fn. 2, 701.) To the extent the contractor was insolvent, the doctrine shifted the risk of loss "to the person who contracted for and thus primarily benefited from the contracted work." (*Id.* at p. 701.)

The peculiar risk doctrine was eventually expanded to allow an employee of a subcontractor to recover from a nonnegligent hirer (usually, a general contractor or a property owner) for injuries caused by the subcontractor's negligence. (*Privette, supra,* 5 Cal.4th at pp. 696–698.) However, in *Privette* the California Supreme Court reconsidered the applicability of the peculiar risk exception in such cases and concluded that the injured employee of a negligent subcontractor could not sue the nonnegligent hirer under the peculiar risk doctrine. It reasoned that California's previously "expansive view" of the peculiar risk doctrine gave the employee an undue windfall relative to other employees injured on the job, whose recoveries would be limited to those damages recoverable under the worker's compensation law, and created the anomalous result of imposing greater liability on a nonnegligent hirer than that of the contractor whose negligence actually caused that injury. (*Privette, supra,* 5 Cal.4th at pp. 698, 702.) The court concluded that the workers' compensation system was adequate to promote workplace safety and to protect the interests of the injured employee and that no societal interest was advanced by such an application of the peculiar risk doctrine, saying "because workplace injuries are covered by workers' compensation, liability under the doctrine of peculiar risk does not extend to the employees of an independent contractor hired to do dangerous work." (*Id.* at pp. 692, 698–702.)

Applying *Privette,* the California Supreme Court has also held that a person who hires an independent subcontractor to do inherently dangerous work, but fails to contractually or otherwise require that the subcontractor take special precautions to avoid the peculiar risks involved in the work, cannot be held liable under the peculiar risk doctrine for injuries to the

subcontractor's employee. (*Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 267 [74 Cal.Rptr.2d 878, 955 P.2d 504] (*Toland*).) The court stressed that its decision "is premised on policy: whether the peculiar risk liability of a general contractor, a landowner, or any other hirer of an independent contractor should, consistent with its common law origins, be limited to protecting third parties such as innocent bystanders or neighboring landowners against the possible insolvency of the hired contractor at fault, or whether such liability should extend to the independent contractor's employees as well. As we concluded in *Privette* . . . it is illogical and unfair that a landowner or other person who hires an independent contractor should have greater liability for the independent contractor's negligence towards the contractor's employees than the independent contractor whose liability is limited to providing workers' compensation coverage." (*Id.* at p. 270.) The court reiterated this point in *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1244 [108 Cal.Rptr.2d 617, 25 P.3d 1096] (*Camargo*), in holding that a hiring property owner or general contractor is not liable for injuries to employees of its independent contractors based on a theory that the owner or contractor was negligent in hiring the independent contractor.

The high court most recently addressed whether the hirer of an independent contractor may be liable for injuries to the contractor's employee resulting from the contractor's negligence under the theory that the hirer retained control of the work but negligently exercised that control. (*Hooker, supra,* 27 Cal.4th 198.) In *Hooker*, the court held that a hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but is liable to such an employee insofar as its exercise of retained control affirmatively contributes to the employee's injuries. (*Id.* at p. 213.) The court reasoned that imposing tort liability where the hirer's exercise of retained control affirmatively contributes to the injury is consistent with *Privette* and its progeny "because the liability of the hirer in such a case is *not* ' "in essence 'vicarious' or 'derivative' in the sense that it derives from the 'act or omission' of the hired contractor." ' [Citations.] To the contrary, the liability of the hirer in such a case is *direct* in a much stronger sense of that term." (*Id.* at p. 212, italics in original; see also *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 222, 225 [115 Cal.Rptr.2d 868, 38 P.3d 1094] [holding that a hirer "is liable to an employee of an independent contractor insofar as the hirer's provision of unsafe equipment affirmatively contributes to the employee's injury"; in such a case it is the hiring party's own negligence, not that of the contractor, that renders it liable].)

The Estate argues that the foregoing cases only address the tort liability of a property owner or general contractor who hires the independent contractor

and that because HWI did not hire Henkels to do the replacement work, the analyses of those cases do not apply here. Although we agree that this case is factually distinguishable from *Privette* and *Hooker* in this respect, we conclude that this factual distinction is legally insignificant. As alleged in the complaint, the Estate's claims are based on the theory that HWI, as the agent of the hirer, is liable to the independent contractor's employee for injuries primarily caused by the negligence of the independent contractor. However, the policies enunciated in *Privette* and *Hooker* are equally applicable in determining the liability of the hirer's agent.

As explained in *Privette*, the peculiar risk doctrine is based on the underlying notion that as between two nonnegligent parties (that is, the person who contracted for the work and the victim of the contractor's negligence), the risk of loss occasioned by the work is more fairly allocated to the person for whose benefit the job is undertaken. (*Privette, supra,* 5 Cal.4th at p. 696.) The Estate points out that, unlike the hirer in *Privette*, HWI did not have a contractual relationship with Henkels and likewise did not pay (indirectly or otherwise) for the costs of providing Ruiz's workers' compensation coverage. However, HWI also did not directly benefit from the work Henkels was hired to do and thus shifting the risk of injury to HWI would not accomplish what the peculiar risk doctrine was designed to achieve, that is, provide assurance of adequate compensation to the victim coupled with a mechanism whereby the ultimate responsibility for the injury will be borne by the person whose fault caused that injury or, failing that, by the person who benefited from the work.

In carrying out Henkels's contract with SDG&E, Ruiz was engaged in work that posed a special risk of harm and his injuries arose out of work for which Henkels bore primary responsibility. Henkels's liability is limited to the benefits available under the workers' compensation law and thus principles of equitable indemnity are not available to shift the liability back to the party who was primarily responsible for the injuries. Under these circumstances, it would be "illogical and unfair" to impose greater derivative liability on HWI than the law would impose on Henkels for its direct negligence in causing Ruiz's injuries. (Cf. *Toland, supra,* 18 Cal.4th at pp. 267, 270.) *Privette* and its progeny preclude such a result.

## 2. *Premises Liability/Nondelegable Duty*

■ Citing primarily *Snyder v. Southern Cal. Edison Co.* (1955) 44 Cal.2d 793 [285 P.2d 912], the Estate nonetheless argues that SDG&E had nondelegable duties under the Public Utilities Code and PUC regulations to ensure

the safety of the premises where Ruiz worked. "[A] nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor." (*Maloney v. Rath* (1968) 69 Cal.2d 442, 446 [71 Cal.Rptr. 897, 445 P.2d 513].) The characterization of a duty as nondelegable is thus a shorthand way of saying that the responsible party cannot escape liability altogether by delegating this duty to someone else. (*Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 790 [9 Cal.Rptr.3d 734].)

■ A hirer has a duty to maintain its premises in a reasonably safe condition for the employees of its independent contractors. (*Grahn v. Tosco Corp.* (1997) 58 Cal.App.4th 1373, 1396 [68 Cal.Rptr.2d 806] (*Grahn*), disapproved on other grounds in *Camargo, supra,* 25 Cal.4th at pp. 1243–1245, and *Hooker, supra,* 27 Cal.4th at pp. 209–210, 214.) Thus, a premises owner's liability to an independent contractor's employee may arise if the worker is injured by a dangerous condition on the land that the landowner created or knowingly failed to remedy. (*Markley v. Beagle* (1967) 66 Cal.2d 951, 955–956 [59 Cal.Rptr. 809, 429 P.2d 129]; *Austin v. Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 233 [282 P.2d 69]; see also *Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1129, fn. 7 [63 Cal.Rptr.2d 359]; *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726 [28 Cal.Rptr.2d 672].)

■ However, "not every dangerous condition on the hirer's premises subjects the hirer to liability for physical harm to the independent contractor's employees." (*Grahn, supra,* 58 Cal.App.4th at p. 1398.) In fact, a number of published California appellate opinions have concluded that a hirer's liability for breaches of a nondelegable duty to maintain its property in a reasonably safe condition is subject to the limitations announced in *Privette* and its progeny. (*Sheeler v. Greystone Homes, Inc.* (2003) 113 Cal.App.4th 908, 921–922 [6 Cal.Rptr.3d 683] (*Sheeler*); *Zamudio v. City and County of San Francisco* (1999) 70 Cal.App.4th 445, 454–455 [82 Cal.Rptr.2d 664]; see also *Park v. Burlington Northern Santa Fe Railway Co.* (2003) 108 Cal.App.4th 595, 606–610 [133 Cal.Rptr.2d 757]; *Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1129 [63 Cal.Rptr.2d 359]; *Srithong v. Total Investment Co., supra,* 23 Cal.App.4th at p. 727 [recognizing that liability for breach of nondelegable duties is a form of vicarious liability]; contra, *Felmlee v. Falcon Cable TV* (1995) 36 Cal.App.4th 1032, 1038–1039 [43 Cal.Rptr.2d 158]; see also *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1134–1136 [120 Cal.Rptr.2d 251] (*Ray*).) In accordance with the authorities so holding, an independent contractor's employee cannot recover against the property owner for breach of such a nondelegable duty

unless the owner's retained control affirmatively contributed to the injury. (E.g., *Sheeler, supra,* 113 Cal.App.4th at pp. 921–922.)

The California Supreme Court is currently considering whether a property owner's liability for injuries to an independent contractor's employee arising from a concealed hazardous condition on the premises is limited by the principles of *Privette.* (*Kinsman v. Unocal Corp.* (Cal. App.), review granted Oct. 29, 2003, S118561█). We need not reach the issue of whether *Privette* and the cases following it preclude a property owner from being liable to an independent contractor's employee for breach of a nondelegable duty to maintain its property in a reasonably safe condition in this case, however, for one very simple reason: assuming that SDG&E had a nondelegable duty to maintain the safety of its electric utility systems for the benefit of the employees of independent contractors hired to work on those systems, the Estate cites us no authority, and we find none, to establish that SDG&E's attempt to delegate such a duty to an agent creates liability *on the part of the agent.*

██ The Estate points to Labor Code section 6400, subdivision (b) as establishing a basis for HWI's liability. That statute provides that, in the event of a jobsite hazard that violates a Cal-OSHA requirement, Cal-OSHA may cite not only the employer whose employees were exposed to the hazard, but also those employers who were responsible, by contract or practice, for health and safety conditions on the worksite or who had the responsibility to correct the hazard. (*Id.,* § 6400, subd. (b)(3), (4).) However, this statute does not create civil liability on the part of specified "employers" to injured employees, for breach of a nondelegable duty or otherwise. (See *Waste Management Inc. v. Superior Court* (2004) 119 Cal.App.4th 105, 110 [13 Cal.Rptr.3d 910] [recognizing that an employer's nondelegable duty under Lab. Code, § 6400 to provide a safe workplace is only imposed on the employee's immediate employer and those who contract with the immediate employer and retain control over the workplace]; see also *Kuntz v. Del E. Webb Const. Co.* (1961) 57 Cal.2d 100, 106 [18 Cal.Rptr. 527, 368 P.2d 127] [holding that Lab. Code, § 6400 "should not be construed as meaning that, where a general contractor or owner of premises does nothing more with respect to the work done by an independent contractor than exercise general supervision and control to bring about its satisfactory completion, it is his responsibility to assure compliance with all applicable safety provisions of the code and regulations issued thereunder"]; *Kirk v. Kemp Bros.* (1970) 12 Cal.App.3d 136, 141 [90 Cal.Rptr. 553] [same].) In accordance with these cases, Labor Code section 6400 does not establish that *HWI* had a nondelegable duty to protect Ruiz from his employer's negligence.

■ The Estate's reliance on Public Utilities Code sections 702 and 2106 and PUC General Order 95, rule 31.1 is similarly misplaced. Those statutory and regulatory provisions govern the obligations of a public utility and a utility's liability to persons injured by its violations of applicable constitutional, statutory or regulatory requirements. The provisions address only the obligations and liability of a utility, i.e., SDG&E, and do not establish a basis for liability on the part of HWI.

■ Finally, the Estate relies on Civil Code section 2343 as the basis for imputing SDG&E's nondelegable duties to HWI. That statute provides that an agent is liable to third persons for wrongful acts taken in the course of the agency. (Civ. Code, § 2343, subd. 3.) However, the statute only makes an agent liable for affirmative misfeasance; it does not render an agent liable to third parties *for the failure to perform duties owed to his principal.* (*Mears v. Crocker First Nat. Bank* (1950) 97 Cal.App.2d 482, 491 [218 P.2d 91].) Thus, Civil Code section 2343 does not make HWI liable to the Estate for any failure to perform its obligations under its contract with SDG&E to monitor safety at the worksite.

## 3. *Direct Liability*

### A. *Retained Control*

■ Under *Hooker*, a hirer of an independent contractor remains liable to an employee of the contractor who is injured during the course of the work where the hirer's retains control over the details of the work and its conduct "affirmatively contribute[s]" to the employee's injuries. (*Hooker, supra,* 27 Cal.4th at pp. 211–212; see also *Biles v. Exxon Mobil Corp.* (2004) 124 Cal.App.4th 1315, 1330–1332 [22 Cal.Rptr.3d 282] [where a hirer's own employees negligently injure a contractor's employee, the hirer is liable for those injuries under the principles of respondeat superior].) A hirer's "affirmative contribution [to the employee's injuries] need not always be in the form of actively directing a contractor or contractor's employee," but may instead arise from an omission or failure to act. (*Hooker, supra,* 27 Cal.4th at p. 212, fn. 3.) "For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Ibid.*) However, a hirer's failure to correct an unsafe practice of which it was aware, and that it retained the authority to correct, does not "affirmatively contribute" to the employee's injury and thus will not support the assertion of a claim against the hirer arising out of that injury. (*Id.* at p. 215.)

As discussed above, the evidence shows that Henkels was responsible for the work and for ensuring that the work was properly and safely performed and that it contractually assumed responsibility for the safety of its employees. Although SDG&E retained the ability to control safety conditions at the jobsite and hired HWI to monitor such conditions, HWI's failure to exercise control in the face of unsafe work practices by the Henkels crew is not actionable. (*Hooker, supra,* 27 Cal.4th at p. 215.) Similarly, HWI's failure to institute particular safety measures at the jobsite is also not actionable absent some evidence that either HWI or SDG&E had agreed to implement such measures. (See *id.* at p. 212, fn. 3.) As the Estate's counsel admitted at oral argument in the proceedings below, there is no evidence that HWI (through Richards) asserted authority over the crew or instructed them as to what safety procedures to use; thus, the evidence, even viewed in the light most favorable to the Estate, does not show that HWI contributed to Ruiz's death by some negligent act or omission that was independent of Henkels's negligence. Rather, it is HWI's *failure* to exercise control, rather than a negligent exercise of control, that is at the heart of the Estate's case.

The Estate relies on *Ray, supra,* 98 Cal.App.4th 1120, in arguing that it is entitled to assert a claim against HWI for failing to intervene in the face of unsafe work practices. In that case, an employee of a bridge subcontractor on a highway construction project was struck and killed by construction materials blown off a bridge by high winds after he blocked oncoming traffic from driving under the bridge and was trying to remove previously blown debris from the roadway. (*Id.* at p. 1124.) The employee's widow sued the joint powers agency (TCA) and the general contractor (Silverado) responsible for the project, asserting they were actively negligent in failing to carry out their duties to maintain the safety of the public road. (*Ibid.*)

The Court of Appeal reversed the trial court's grant of summary judgment in favor of TCA and Silverado, based in large part on evidence that TCA had contractually agreed with the California Department of Transportation to take necessary precautions to protect the traveling public and that Silverado's contract with the subcontractor prohibited the subcontractor from erecting road barricades without Silverado's advance written permission. (*Ray, supra,* 98 Cal.App.4th at pp. 1131–1133.) The court concluded that TCA and Silverado's retention of control over the roadways was sufficient to establish "an independent duty [on their part] to block the roadway so as to bar persons from crossing under the bridge when there was a risk of harm" and to support triable issues of fact as to whether their failure to do so affirmatively contributed to the employee's death. (*Id.* at pp. 1128, 1133, 1137–1139.)

The facts of *Ray* are distinguishable from the facts presented here in several important respects. In *Ray*, the general contractor and the agency not only retained the right to control traffic safety, but also contractually precluded the subcontractor from implementing the precise safety precaution that the plaintiff contended was necessary to protect the public, including her husband, from the risk of falling debris. The plaintiff's theory was that Silverado and TCA owed her husband a duty, not as the employee of a subcontractor on the job but as a member of the public using the road, and that their breach of this duty to keep the roadway safe caused his death. (*Ray, supra*, 98 Cal.App.4th at pp. 1128–1129.)

Here, the Estate's theory of liability is based on the notion that HWI owed a duty to Ruiz *as an employee of Henkels* to make sure that Henkels's crew used safe work practices in replacing the insulators on the tower. However, the contracts between the parties here placed the duty of ensuring that adequate safety precautions were in place during the work on Henkels, not on HWI, and, unlike the situation in *Ray*, there is no evidence that SDG&E prohibited Henkels from undertaking practices or procedures that Henkels believed were necessary to keep the crew members working on the tower safe. That HWI was authorized to stop the work if Henkels failed to comply with its contractual obligations, but did not use that authority, is not sufficient to establish liability. (*Hooker, supra*, 27 Cal.4th at p. 209.) The evidence before us does not create any triable issue of fact that HWI exercised its retained control in such a manner that affirmatively contributed to Ruiz's electrocution.

## B. *Failure to Undertake Adequate Rescue Measures*

Finally, the Estate contends that SDG&E had a duty under the California Code of Regulations and industry standards to have a rescue plan in the event of injury to someone who was working on an electric utility tower. It contends that HWI breached this duty by failing to ensure that there was a bucket truck on site that was tall enough to reach the top phase of the tower, failing to request that TL 23006 be deenergized once Ruiz was hurt, failing to immediately notify the SDG&E operations supervisor of the incident and failing to request that another crew member or an SDG&E representative assist Fairbairn in the rescue efforts. As with the Estate's theory of HWI's liability for SDG&E's breach of nondelegable duties, however, the fact that SDG&E had certain duties to Ruiz does not mean that HWI also owed him those duties. In the absence of persuasive authority to establish that HWI owed Ruiz an affirmative duty to undertake rescue measures, the Estate has not established that the court erred in holding that HWI's failure to take such measures did not render HWI liable for Ruiz's death.

## DISPOSITION

The judgment is affirmed. HWI is entitled to recover its costs on appeal.

McConnell, P. J., and Benke, J., concurred.

A petition for a rehearing was denied July 7, 2005, and appellant's petition for review by the Supreme Court was denied August 24, 2005.