Filed 2/2/18; pub. order 2/27/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LUZ ELENA DELGADILLO et al., | B270985 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC512758) |
| v. | |
| TELEVISION CENTER, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle W. Court, Judge.  Affirmed.

Abir Cohen Treyzon Salo, Federico C. Sayre, Boris Treyzon and Cynthia Goodman for Plaintiffs and Appellants.

Diederich & Associates and Robert E. Henke for Defendant and Respondent.

Plaintiffs Luz Elena Delgadillo, Christian Franco, and Valeria Franco (plaintiffs) are the surviving wife and children, respectively, of Salvador Franco (decedent). Decedent fell to his death while washing windows on a building owned by defendant Television Center, Inc. (TCI).

Plaintiffs sued TCI for negligence and negligence per se, alleging that decedent was fatally injured because TCI failed to install structural roof anchors, as required by statute, to which decedent could attach a descent apparatus. TCI moved for summary judgment, contending that plaintiffs' suit was barred by *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and subsequent cases. The trial court agreed and granted summary judgment for TCI.

We affirm. *Privette* and its progeny hold that when a property owner hires an independent contractor, the property owner is not liable for injuries sustained by the contractor's employees unless the defendant's affirmative conduct contributed to the injuries. In the present case, the undisputed evidence was that TCI did not direct how the window washing should be done nor otherwise interfere with the means or methods of accomplishing the work. Accordingly, summary judgment was properly granted.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Underlying Facts

TCI owns a three-story commercial building located at 6311 Romaine Street, Hollywood, California (the building). In 2011, TCI contracted with Chamberlin Building Services (CBS), a licensed contractor, to wash the building's windows. Decedent worked as a supervisor/window cleaner for CBS.

On June 20, 2011, while decedent was washing the building's windows, his descent apparatus detached and he fell to his death. He was survived by his wife and children.

Decedent's wife and children filed the present action against TCI on June 20, 2013. The operative complaint alleges that TCI failed to equip the building with structural roof anchors to which a descent apparatus could be attached, in violation of sections 7325 through 7332 of the Labor Code, and section 3286, subdivision (a)(4), of title 8 of the California Code of Regulations, giving rise to causes of action for negligence and negligence per se.

## II.

### TCI's Motion for Summary Judgment

TCI filed a motion for summary judgment on August 27, 2015. It asserted that plaintiffs were barred from recovering by *Privette* and its progeny because TCI had contracted with CBS to wash the building's windows and had not retained control over the manner in which the work would be done. In support of its motion for summary judgment, TCI introduced evidence of the following:

TCI purchased the building in approximately 1986. In April 2010, TCI contracted with CM Cleaning Solutions, Inc. (CM Cleaning) to provide the building with cleaning/janitorial services.

In 2010, CM Cleaning, on behalf of TCI, solicited a proposal from CBS to wash the building's windows. In 2011, CBS's proposal was accepted. TCI did not provide CM Cleaning or CBS with a written assurance that it had anchor points that could safely support 5000 kilograms of weight.

When CBS initially submitted its proposal to TCI, it planned to use either a "Tucker Pole System" (a water-fed pole with an attached brush) or ladders to reach the building's upper-story windows. However, when Edward Chamberlin of CBS, and two of his employees, George Gonzalez and decedent, walked around the building on June 20, 2011, they observed wires, lines, and telephone poles on the building's south side. Because of the proximity of the wires to the building, Chamberlin was concerned about a danger of electrocution, and therefore decided not to use water-fed poles to reach the upper-story windows.

Chamberlin, Gonzalez, and decedent requested access to the building's roof. There, they determined that one side of the building had adequate anchor points to which they could attach a controlled descent apparatus; the other side did not.[1] They therefore decided that Gonzalez and decedent would rappel off the building from the roof using roof anchor points on the first day, and would construct a steel cable tie-back anchor system to which they could connect on the second day.

It was CBS's policy that two connectors were required when rappelling off a building: one primary line and one safety line. However, late in the morning of the first day, decedent attached his line to only a single connector—an angle iron bracket supporting the air conditioning unit on the roof, attached to a small piece of wood—which was not an acceptable anchor point. The bracket to which decedent attached his line failed, and decedent fell to his death.

Before CBS began cleaning the building's windows on June 20, 2011, building security had allowed Chamberlin,

---

[1]     Plaintiffs dispute that there were any adequate roof anchor points.

4

Gonzalez, and decedent access to the building's roof, but no one from TCI or CM Cleaning accompanied the three men when they inspected the roof. CBS and its employees made all decisions about how the window-washing would be accomplished.

The window-washing equipment used on the job was owned, inspected, and maintained by CBS.[2] Decedent's family received workers' compensation benefits following his death.

### III.
### Plaintiffs' Opposition to Motion
### for Summary Judgment

Plaintiffs opposed the motion for summary judgment. Citing *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 (*McKown*), plaintiffs asserted that if the hirer of an independent contractor provides defective tools or equipment to the contractor's employees, the hirer may be held liable for any resulting injuries. Plaintiffs urged there thus were triable issues of fact in the present case as to (1) whether the defective anchor points on the building's roof were "tools or equipment" within the meaning of *McKown*, and (2) whether TCI retained control of the workplace in a way that affirmatively contributed to decedent's death.

In support of their opposition, plaintiffs submitted the declaration of Amit Gupta, a senior safety engineer for the California Division of Occupational Safety and Health Research and Standards Development Safety Unit. Gupta's declaration stated in relevant part as follows:

---

[2] Plaintiffs dispute this assertion only insofar as they contend that the building's structural anchor points are window washing equipment.

5

"During the investigation of the death of Salvador Franco, I met with Ana Ramirez, Property Manager of [TCI] and I advised her of the following:

"1.  The rigging for the Controlled Descent Apparatus (CDA) gave way causing [decedent] to fall approximately fifty (50) feet to the concrete down below.

"2.  California Labor Code Section[s] 7325-7332 require that owners of all buildings three or more stories provide anchors or other equipment detailed in Article 5 and 6 of the General Industrial Safety Orders.

"3.  The building referenced is not equipped with roof anchors.

"4.  Because of the proximity of electrical lines on at least two sides of the building (East & South) the building may not be cleaned using ground-based equipment.

"5.  There is no safe method of cleaning that building that we have been made aware of[.]  [T]herefore[,] as authorized by Labor Code Section 7331[3] I . . . gave notice that the window cleaning on the building referenced is suspended.  Windows cannot be cleaned on any side of the building until required equipment or procedures are in place. . . .  [¶] . . . [¶]

---

[3]      Labor Code section 7331 provides:  "The division may make and enforce such safety orders and rules as it considers necessary and proper to carry into effect the purposes and provisions of this chapter.  [¶]  The division shall give notice to the owner or person entitled to possession of any building that is existing in violation of this chapter or of any rules issued under this chapter.  Failure of the person so notified to comply with this chapter and rules issued under it, within 15 days, shall be authority for the division to proceed against such person as authorized in this chapter."

"7.  [T]he building must have an OPOS [Operating Procedures Outline Sheet] when using a CDA [controlled descent apparatus] to clean windows.

"8.  The building owner did not provide a letter of assurance for approved anchor points to the window cleaning company and the building did not have approved anchor points."

Plaintiffs also submitted the declaration of Brad Avrit, a civil engineer and safety expert.  Avrit's declaration stated, in pertinent part:

"8.  Pursuant to Title 8 of the California Code of Regulations Section 3282(a):  'Windows shall not be cleaned from the outside or inside unless means are provided to enable such work to be done in a safe manner as provided by these orders.'

"9.  Section 3282 applies to building owners as well as companies who provide window washing services.  (*See* 8 CCR § 3282(p)(1)(A).)

"10.  As part of making the building safe for window washers to wash the windows of a building, the building owner has a statutory duty to install approved anchors on the building for window washers to hook their gear.  (*See* 8 CCR § 3283.)

"11.  Anchor points are tools/equipment affixed to buildings which window washers use to attach their equipment to descen[d] the side of a building.  Anchor points are considered safety devices for window washers, as they are used to connect the gear, like ropes and cables to the building.

"12.  Window washers do not provide their own anchor points.

"13.  Building owners in the State of California have a duty to provide approved anchor points.

7

"14. On the date that Mr. Franco fell to his death, June 20, 2011, Defendant [TCI]'s building . . . did not have approved anchor points.

"15. California Code of Regulations Section 3282(p)(1)(A) states in relevant part: 'Building owners shall provide the employer written assurance, before use, that all their building's safety devices and equipment meet the provisions of these orders. The written assurance shall consider, but not be limited to: window anchors and fittings. . . .' . . . [¶] . . . [¶]

"32. The proximity of the powerlines on the southern side of the building made it unsafe to wash the windows on the southern side of the building from the ground.

"33. The only other option for cleaning the windows above the first floor would be to rappel off the side of the building."

## IV.

## Trial Court's Grant of Summary Judgment

The trial court granted summary judgment for TCI on January 15, 2016, and judgment was entered on March 4, 2016. The court found that TCI met its burden as moving party to show that it hired CBS to clean the building's windows and did not either retain control over the window cleaning or affirmatively contribute to decedent's fall. The court found that plaintiffs attempted to demonstrate a triable issue of material fact by arguing that TCI provided defective equipment in connection with the fall; TCI retained control over the roof from which decedent fell; and TCI breached nondelegable duties in connection with the fall. The trial court rejected each of these theories, concluding that, as a matter of law, roof anchors were not "equipment;" restricting roof access did not constitute retained control over a window-washing job; and TCI's duty to

8

provide a safe workplace for its contractor's employees was delegable.

Plaintiffs timely appealed from the judgment.

**STANDARD OF REVIEW**

"A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.]

"A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, 'one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action.'  (Code Civ. Proc., § 437c, subds. (a), (p)(2).)  Once the defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact.  [Citation.]  'From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law.'  [Citation.]  We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent.  [Citation.]  We consider all of the evidence the parties offered in connection with the motion, except that which the court properly excluded.

[Citation.]"  (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1292–1293.)

## DISCUSSION

### I.

### Background

At common law, a person who hired an independent contractor to perform a task generally was not liable to third parties for injuries caused by the independent contractor's negligence.  Central to this rule of nonliability " 'was the recognition that a person who hired an independent contractor had " 'no right of control as to the mode of doing the work contracted for.' " ' "  (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 598 (*SeaBright*).)

One exception to the common law rule that a hirer is not liable for the torts of an independent contractor is the doctrine of peculiar risk.  Under this doctrine, "a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others.  By imposing such liability without fault on the person who hires the independent contractor, the doctrine seeks to ensure that injuries caused by inherently dangerous work will be compensated, that the person for whose benefit the contracted work is done bears responsibility for any risks of injury to others, and that adequate safeguards are taken to prevent such injuries."  (*Privette, supra,* 5 Cal.4th at p. 691.)  The doctrine of peculiar risk thus represents a limitation on the common law rule and a corresponding expansion of hirer vicarious liability.

In its 1993 decision in *Privette, supra,* 5 Cal.4th 689, the California Supreme Court held that the peculiar risk doctrine did

10

not apply to injured employees of independent contractors. *Privette* concerned a roofing contractor's employee who was injured when he fell off a ladder and was burned by hot tar. The employee sued the owner of the home he had been roofing, contending that the homeowner was liable for his injuries under the doctrine of peculiar risk. (*Id*. at pp. 692–693.) The Supreme Court held that while the homeowner would be liable to an "innocent bystander" (*id*. at p. 701) injured by the independent contractor's negligence, he was not liable to the independent contractor's employee. The court explained: "[T]he peculiar risk doctrine seeks to ensure that injuries caused by contracted work will not go uncompensated, that the risk of loss for such injuries is spread to the person who contracted for and thus primarily benefited from the contracted work, and that adequate safety measures are taken to prevent injuries resulting from such work. [Citation.] But in the case of on-the-job injury to an employee of an independent contractor, the workers' compensation system of recovery regardless of fault achieves the identical purposes that underlie recovery under the doctrine of peculiar risk. It ensures compensation for injury by providing swift and sure compensation to employees for any workplace injury; it spreads the risk created by the performance of dangerous work to those who contract for and thus benefit from such work, by including the cost of workers' compensation insurance in the price for the contracted work; and it encourages industrial safety." (*Ibid*.) Thus, the court concluded, "when considered in light of the various goals that the workers' compensation statutes seek to achieve, [the conclusion] that peculiar risk liability should extend to the employees of the independent contractor, does not withstand scrutiny." (*Id*. at pp. 701–702.)

11

In subsequent cases, the Supreme Court expanded the *Privette* doctrine to hold that a hirer could not be held vicariously liable to an independent contractor's employees under a variety of tort theories. (E.g., *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [hirer of an independent contractor not liable to contractor's employee for failing to specify that the contractor should take special precautions to avert a risk]; *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [hirer of an independent contractor not liable to contractor's employee for negligent hiring]; *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 522 (*Tverberg*) ["Having assumed responsibility for workplace safety, an independent contractor may not hold a hiring party *vicariously* liable for injuries resulting from the contractor's own failure to effectively guard against risks inherent in the contracted work."].)

In the present case, it is undisputed that under *Privette* and its progeny, TCI is not vicariously liable to plaintiffs for the negligence of CBS or its employees. Plaintiffs urge, however, that *Privette* does *not* bar their direct liability claims against TCI under the doctrines of (1) nondelegable duties, and (2) negligent exercise of retained control. We consider these issues below.

## II.
## Breach of Nondelegable Duties

The nondelegable duties doctrine " 'prevents a party that owes a duty to others from evading responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work.' [Citation.]" (*Vargas v. FMI, Inc.* (2015) 233 Cal.App.4th 638, 649.) In the present case, plaintiffs contend that as a building owner, TCI had a statutory duty pursuant to Cal-OSHA and other regulations to install roof anchors to which

12

window washers could attach their gear. They further contend this statutory duty was nondelegable, and its breach gave rise to liability not barred by the *Privette* doctrine.

For the reasons that follow, we conclude that under *SeaBright*, *supra*, 52 Cal.4th 590, TCI's tort law duty to decedent to provide a safe workplace was delegated to CBS as a matter of law, and thus TCI is not liable to plaintiffs for damages caused by TCI's failure to install statutorily-required roof anchors.

A.    SeaBright Ins. Co. v. US Airways, Inc.

*SeaBright* addressed the application of *Privette* to a nondelegable duty claim. In that case, an employee of Aubry Co., an independent contractor, was injured while repairing a luggage conveyor controlled by US Airways, allegedly because the conveyor lacked safety guards required by the California Occupational Safety and Health Act (Cal–OSHA) (Lab. Code, § 6300 et seq.). Aubry's insurer paid workers' compensation benefits to the injured employee and then sued US Airways, contending that the airline was responsible for the employee's injuries under the nondelegable duty doctrine because the duty to provide safety guards derived from a " 'statute or by administrative regulation.' " (*SeaBright*, *supra*, 52 Cal.4th at pp. 594, 596.)

The trial court granted summary judgment for US Airways; the Court of Appeal reversed, concluding that US Airways's duty under Cal–OSHA to ensure that the conveyor had safety guards was nondelegable. (*SeaBright*, *supra*, 52 Cal.4th at pp. 594–595.) The Supreme Court then granted review to consider the following question: "[W]hether the *Privette* rule applies when the party that hired the contractor (the hirer) failed to comply with workplace safety requirements concerning the precise subject

13

matter of the contract, and the injury is alleged to have occurred as a consequence of that failure." (*Id.* at p. 594.)

The Supreme Court held that the *Privette* rule applied to the case before it, and therefore US Airways was not liable to the injured employee or, derivatively, to the workers' compensation insurer. The court explained that by hiring an independent contractor, "the hirer implicitly delegates to the contractor any tort law duty it owes *to the contractor's employees* to ensure the safety of the specific workplace that is the subject of the contract. That implicit delegation includes any tort law duty the hirer owes to the contractor's employees to comply with applicable statutory or regulatory safety requirements." (*SeaBright, supra,* 52 Cal.4th at p. 594.) In the case before it, therefore, "US Airways presumptively delegated to Aubry any tort law duty of care the airline had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of Aubry employees. The delegation—which . . . is implied as an incident of an independent contractor's hiring—included a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard." (*Id.* at p. 601.)

In reaching this conclusion, the high court rejected the distinction drawn by the Court of Appeal between the safety requirements that arose from the work performed by the independent contractor, and that which predated the contractor's hiring and applied to the hirer by virtue of its role as property owner. The court explained: "In the view of the Court of Appeal, the latter requirements are nondelegable. Conversely, tort law duties that 'only exist because construction or other work is being performed' can be delegated to the contractor hired to do the work. We acknowledge the distinction, but for the reasons given

14

below, we conclude that the Court of Appeal did not apply the distinction correctly.

"Before hiring independent contractor Aubry, defendant US Airways owed *its own* employees a duty to provide a safe workplace.  We do not suggest that defendant could delegate *that* preexisting duty to Aubry (such that defendant could avoid liability if the conveyor had injured *defendant's own* employee).  But . . . the issue here is whether defendant US Airways implicitly delegated to contractor Aubry the tort law duty, if any, that it had to ensure workplace safety for *Aubry's employees*.  The latter duty did not predate defendant's contract with Aubry; rather, it arose out of the contract.  Any tort law duty US Airways owed to Aubry's employees only existed because of the work (maintenance and repair of the conveyor) that Aubry was performing for the airline, and therefore it did not fall within the nondelegable duties doctrine."  (*SeaBright*, *supra*, 52 Cal.4th at pp. 602–603.)

The court further noted that the policy favoring delegation in the case before it was bolstered by the same factors it considered persuasive in *Privette*.  It explained:  "*Privette* noted that the cost of workers' compensation insurance for an independent contractor's employees is presumably included in the contract price the hirer pays to the contractor, and therefore the hirer indirectly pays for that insurance.  (*Privette*, at p. 699.) *Privette* further noted that workers' compensation guarantees compensation for injured workers, 'spreads the risk created by the performance of dangerous work to those who . . . benefit from such work,' and 'encourages industrial safety.'  (*Id*. at p. 701.) Also, in light of the limitation that the workers' compensation law places on the independent contractor's liability (shielding the

latter from tort liability), it would be unfair to permit the injured employee to obtain full tort damages from the *hirer* of the independent contractor—damages that would be unavailable to employees who did not happen to work for a hired contractor. This inequity would be even greater when, as is true here, the independent contractor had sole control over the means of performing the work. [Citation.] In sum, we see no reason to limit our holding in *Privette* simply because the tort law duty, if any, that the hirer owes happens to be one based on a statute or regulation." (*SeaBright*, *supra*, 52 Cal.4th at p. 603.)

B. SeaBright *Is Dispositive of Plaintiffs' Nondelegable Duty Claim*

In the present case, plaintiffs contend that TCI had a statutory duty as a building owner to install structural roof anchors to which window washers could attach their controlled descent equipment. They identify several sources for the asserted duty to provide building anchors, including California Code of Regulations, title 8, sections 3281 to 3289; Health and Safety Code section 17920.3; Labor Code sections 7326 to 7329; Los Angeles Municipal Code section 91.8104; and International Window Cleaning Association I-14.1 guidelines, section 3.9.

For purposes of this appeal, we assume that these sections required TCI to equip its building with structural roof anchors, and that TCI failed to do so. We nonetheless do not agree that there were triable issues as to whether TCI's breach of its statutory duties gave rise to liability not barred by the *Privette* doctrine. To the contrary, *SeaBright* compels the conclusion that when TCI hired CBS, an independent contractor, to provide window washing services, it delegated to CBS its duty to provide a safe workplace for CBS's employees. Accordingly, TCI's alleged

16

breach of a statutory duty to provide safety anchors did not give rise to rise to liability to decedent or his survivors.

Plaintiffs urge that the present case is distinguishable from *SeaBright* because their claims "[are] not exclusively based upon OSHA violations." We are not persuaded that TCI had a statutory duty, *independent of* the duty imposed by OSHA regulations, to provide roof anchors—but even if TCI had such a duty, we do not agree that *SeaBright*'s holding is properly limited to Cal-OSHA. *SeaBright* holds that by hiring an independent contractor, a hirer implicitly delegates to the contractor the tort law duty the hirer owes to the contractor's employees "to comply with *applicable statutory or regulatory safety requirements*" to ensure workplace safety—including a duty to "identify the absence of safety guards" and "take reasonable steps to address that hazard." (*SeaBright, supra*, 52 Cal.4th at pp. 594, 601, italics added.)[4] Although the specific regulations at issue in *SeaBright* arose under Cal-OSHA, nothing in the court's analysis or reasoning suggests its holding is limited to Cal-OSHA "statutory or regulatory safety requirements." Rather, its expansive language indicates that the high court intended its holding to extend to *all* statutory or regulatory safety requirements. Accordingly, we conclude that under *SeaBright*, TCI implicitly delegated to CBS its duties under Cal-OSHA *and* non-Cal-OSHA sources to provide a safe workplace for decedent.

---

[4] *SeaBright* suggests that the result might be different in a situation "in which the relevant statutes or regulations indicate an intent to limit the application of *Privette* . . . or preclude delegation of the tort law duty, if any, that the hirer owes to the contractor's employees." (*SeaBright, supra*, 52 Cal.4th at p. 594, fn. 1.) No such intent is indicated in the present case.

Thus, the trial court properly granted TCI's motion for summary judgment on the breach of nondelegable duties theory of recovery.

## III.

## Negligent Exercise of Retained Control

Plaintiffs assert in the alternative that there were triable issues of fact as to whether TCI affirmatively contributed to decedent's death by negligently exercising retained control over decedent's worksite. In support, they rely on *McKown*, *supra*, 27 Cal.4th 219, which they suggest is "remarkably similar to" the present case. For the reasons that follow, we do not agree.

*A.* McKown v. Wal-Mart Stores, Inc.

Plaintiff McKown was an employee of an independent contractor hired by Wal-Mart to install speakers in the ceilings of Wal-Mart stores. Wal-Mart requested that the contractor use Wal-Mart's forklifts whenever possible and furnished the plaintiff a forklift for use. (*McKown*, *supra*, 27 Cal.4th at p. 223.) However, the forklift Wal-Mart provided to McKown was defective; specifically, the forklift's platform was not chained to the forklift as safety standards required. As a result, the platform disengaged and McKown fell 12 to 15 feet, suffering injury. (*Ibid.*)

A jury found that Wal-Mart was negligent in providing the contractor with unsafe equipment and allocated 23 percent of the responsibility for the accident to Wal-Mart. Both the Court of Appeal and the Supreme Court affirmed. (*McKown*, *supra*, 27 Cal.4th 219.)

The Supreme Court explained that in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, it had held "that a hirer of an independent contractor is not liable to an

18

employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but that a hirer is liable to an employee of a contractor insofar as a hirer's *exercise of retained control* affirmatively contributed to the employee's injuries." (*McKown, supra*, 27 Cal.4th at p. 225, italics added.) For the same reason, "when a hirer of an independent contractor, by negligently furnishing unsafe equipment to the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Ibid.*) In the case before it, Wal-Mart's provision of an unsafe forklift to McKown affirmatively contributed to the plaintiff's injuries, and thus Wal-Mart was held liable for its negligence. (*Id.* at p. 226.)

B.     McKown *Does Not Govern the Present Case*

Plaintiffs contend that in opposition to TCI's motion for summary judgment, they provided evidence through the declarations of Gupta and Avrit that anchor points were "equipment" within the meaning of *McKown*, and therefore a jury should have been permitted to decide whether TCI "negligently provided unsafe equipment that contributed to [decedent's] injuries." We do not agree that plaintiff's summary judgment evidence raised a triable issue of fact, because the relevant issue under *McKown* and subsequent cases is not whether "equipment" caused an employee's injury, but rather whether the hirer retained control over the worksite "in a manner that *affirmatively contributed* to the injury." (*Tverberg, supra*, 202 Cal.App.4th at p. 1446.)

As one Court of Appeal has explained, an affirmative contribution to injury occurs "[w]hen the [hirer] directs that work be done by use of a particular mode or otherwise interferes with

19

the means and methods of accomplishing the work . . . . (*Hooker*, *supra*, 27 Cal.4th at p. 215; *Millard v. Biosources, Inc.* (2007) 156 Cal.App.4th 1338, 1348.)" (*Tverberg*, *supra*, 202 Cal.App.4th at p. 1446.)  By contrast, "passively permitting an unsafe condition to occur rather than directing it to occur does *not* constitute affirmative contribution.  (*Hooker*, *supra*, 27 Cal.4th at pp. 214–215; *Ruiz v. Herman Weissker, Inc.* (2005) 130 Cal.App.4th 52, 65–67.)" (*Tverberg*, *supra*, 202 Cal.App.4th at p. 1446, italics added.)

In the present case, while TCI arguably "provided" the inadequate anchor points to CBS, it did not suggest or request that CBS use the anchor points to wash the building's windows. To the contrary, the undisputed evidence before the trial court was that "[CBS] and its employees made all decisions as to how the job was to be done."  Further, it was undisputed that when CBS decided on June 20, 2011, to change the method by which the building's windows would be washed—that is, to have CBS employees rappel off the roof using structural anchor points and a tie-back anchor system, rather than clean the windows from the ground using water-fed poles—it did so without direction by, consultation with, or notice to TCI.  Accordingly, there is no evidence that TCI directed how the window washing should be performed or otherwise interfered with the means or methods of accomplishing the work.

Although plaintiffs concede that CBS had exclusive control over how the window washing would be done, they urge that TCI nonetheless is liable because it affirmatively contributed to decedent's injuries "not [by] active conduct *but . . . in the form of an omission to act*."  Although it is undeniable that TCI's failure to equip its building with roof anchors contributed to decedent's

20

death, *McKown* does not support plaintiffs' suggestion that a passive omission of this type is actionable. To the contrary, *McKown* explained that Wal-Mart was liable because it *requested* that the contractor use its forklift, and "Wal-Mart, the world's largest retailer, was a customer the contractor was presumably loath to displease." (*McKown*, *supra*, 27 Cal.4th at p. 225.) Subsequent Supreme Court decisions, including the court's decision in *SeaBright*, have repeatedly rejected the suggestion that the passive provision of an unsafe workplace is actionable. (E.g., *SeaBright*, *supra*, 52 Cal.4th 590 [hirer not liable for injury to a contractor's employee caused by *the absence of* statutorily mandated safety equipment]; *Hooker*, *supra*, 27 Cal.4th 198, 214–215 ["[Hirer] Caltrans *permitted* construction vehicles . . . to use the overpass while the crane was being operated [by the decedent], and because the overpass was narrow, the [decedent] was *required* to retract the outriggers in order to let the traffic pass . . . . [¶] We are not persuaded that Caltrans, by *permitting* traffic to use the overpass while the crane was being operated, *affirmatively contributed* to [decedent's] death."].) Accordingly, the failure to provide safety equipment does not constitute an "affirmative contribution" to an injury within the meaning of *McKown*.

## DISPOSITION

The judgment is affirmed.  TCI is awarded its appellate costs.


                                        EDMON, P. J.


We concur:



        LAVIN, J.



        DHANIDINA, J.*

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LUZ ELENA DELGADILLO et al., | B270985 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC512758) |
| v. | |
| TELEVISION CENTER, INC., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-referenced matter filed February 2, 2018, was not certified for publication in the Official Reports. For good cause shown it now appears that the opinion should be published in the Official Reports.

[There is no change in the judgment.]

_____

EDMON, P. J.          LAVIN, J.          DHANIDINA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.