Filed 2/11/21  WMC-SA, Inc. v. ReadyLink, Inc. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| WMC-SA, INC.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>READYLINK, INC.,<br><br>    Defendant and Appellant. | G057040<br><br>(Super. Ct. No. 30-2013-00666494)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Frederick P. Horn, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Vaughn & Vaughn, Donald A. Vaughn and Evan J. Topol for Plaintiff and Appellant.

Klein & Wilson, Gerald A. Klein and Brian M. Kelly for Defendant and Appellant.

\*        \*        \*

Defendant ReadyLink, Inc., is a staffing agency that agreed to provide temporary nurses to plaintiff Western Medical Center – Santa Ana (Western). The parties' contract contained an indemnity agreement, in which ReadyLink agreed to indemnify and defend Western for any patient injuries caused by a ReadyLink nurse. Nonparty Daniel Stearns was injured in a car accident and taken to Western for surgery and recovery. Months after his hospitalization, Stearns sued Western for injuries allegedly arising from the postoperative care he received. One of his postoperative nurses, Suvarna Durgiah, was from ReadyLink. So, Western requested that ReadyLink indemnify it for the claim and provide a defense per the contract. ReadyLink refused both requests, and Western eventually settled with Stearns for $450,000.

Western then sued ReadyLink for indemnity and reimbursement of its attorney fees and costs defending the Stearns lawsuit. The case went to trial and was bifurcated into separate phases. In the first phase, the trial court rejected ReadyLink's argument that the indemnity agreement was invalid as a matter of law under the nondelegable duty doctrine. The second phase focused solely on whether nurse Durgiah had been negligent. The jury found that she had not, which precluded Western from recovering any indemnity. Finally, in the third phase, the jury found that ReadyLink had not breached its duty to defend Western. Judgment was then entered in favor of ReadyLink and against Western.

Western appeals the judgment on two grounds. First, it contends the trial court erred by failing to apply a rebuttable presumption during phase two of the trial. During phase two, the burden was on Western to prove that Stearns had suffered harm from his hospitalization. Had the presumption been applied as requested by Western, the burden of proof would have shifted to ReadyLink to prove that Stearns was not harmed. Western speculates that this failure to shift the burden led the jury to find that nurse Durgiah was not negligent because Stearns had not sustained harm. Second, Western contends the trial court improperly allowed one of ReadyLink's rebuttal experts to

2

provide opinions outside the scope of impeachment. Had these errors not occurred, Western argues the jury likely would have reached a different result.

We disagree. Even assuming the trial court erred, the alleged errors are not so prejudicial as to warrant reversal. As to the presumption, even if it had been applied as requested by Western, it would have had limited effect. Three elements were needed to establish nurse Durgiah's negligence: (1) Stearns suffered harm; (2) nurse Durgiah did not meet her standard of care; and (3) her actions were a substantial factor in causing Stearns' harm. The presumption would have only shifted the burden to ReadyLink on the first element. But there was considerable evidence at trial that Stearns did not suffer any harm. Thus, it made little difference which party had the burden on that issue. Further, even if the jury found that Stearns had been harmed, there was ample evidence that nurse Durgiah was not a factor in causing it. The evidence showed that Stearns' alleged injuries occurred after her shift. Thus, merely shifting the burden to ReadyLink to prove Stearns was not harmed was unlikely to affect the jury's verdict. As to ReadyLink's expert, most of the disputed testimony was cumulative of other witnesses and appeared to have little effect on the jury's verdict.

ReadyLink also filed a cross-appeal, arguing the trial court erred by finding the indemnity agreement to be valid. ReadyLink claims Western is completely responsible for a nurse's onsite conduct and cannot delegate tort liability back to ReadyLink under the nondelegable duty doctrine. That doctrine is inapplicable here. Generally, it is designed to safeguard the public by preventing parties from shielding themselves from liability by hiring independent contractors to perform risky activities. Invalidating the indemnity agreement would subvert that purpose by reducing incentives for staffing agencies like ReadyLink to ensure that the nurses they employ are competent.

For these reasons, we affirm the judgment.

3

# I

## FACTS AND PROCEDURAL HISTORY

### A. *The Parties' Contract*

Western is a hospital located in Santa Ana. ReadyLink is a staffing agency that provides temporary nurses to medical care providers. The parties entered into a contract in July 2010, wherein ReadyLink agreed to provide temporary nurses to Western. The contract contained an indemnity agreement, in which ReadyLink agreed to "save and hold [Western] . . . harmless from and against, and [would] indemnify [Western] . . . for, any liability, loss, cost, expense or damage whatsoever caused by reason of any injury sustained by any person . . . by reason of any act, neglect, default or omission of [ReadyLink] or any of its agents, subcontractors, employees or other representatives." ReadyLink also agreed to defend Western if it was "sued in any court for damages by reason of any of the acts of [ReadyLink], its agents, subcontractors, employees or other representatives . . . ."

### B. *The Stearns Lawsuit*

On January 7, 2011, Stearns was involved in a car accident that shattered the tibia in his right leg into four pieces. He was hospitalized at Western, where Dr. Ahmad Hajj performed an open reduction internal fixation surgery (O.R.I.F.) that same day. The O.R.I.F. involved drilling holes into Stearns' tibia, inserting a rod through the bone, manipulating the broken bone around the rod, and then screwing the rod into the bone. The night after his surgery, he was cared for by nurse Durgiah, who had been sent to Western by ReadyLink per the contract.

In September 2011, Stearns filed a lawsuit alleging various malpractice and negligence claims against Western, Dr. Hajj, and Dr. Christopher Lane, who also treated Stearns at Western. Stearns claimed that following his surgery, he developed compartment syndrome in his right leg that was not timely treated, causing him

4

permanent injury. Compartment syndrome is an excruciating and uncommon condition resulting from increased blood pressure within a muscle compartment in the body. The increased blood pressure impedes blood flow to the muscle tissue, depriving the muscles of oxygen. If not timely treated, it results in dead muscle and nerve damage.

In June 2012, Western tendered its defense to ReadyLink and requested indemnity on grounds that nurse Durgiah had been implicated as a responsible party in Stearns' discovery responses. Western provided a copy of the complaint, Stearns' interrogatory responses, and pages from Stearns' medical records containing nurse Durgiah's notes for the relevant time period. ReadyLink rejected the tender in August 2012, on grounds that Stearns' claims focused on the conduct of his doctors and that neither his complaint nor his discovery responses definitively implicated nurse Durgiah.

Western and Stearns settled in November 2012 for $450,000. Western incurred $88,509.94 in fees and costs litigating the matter.

*C. The Instant Lawsuits*

In March 2013, Western requested that ReadyLink indemnify it for the settlement payment and its attorney fees and costs. ReadyLink refused, so Western filed suit in August 2013 against ReadyLink and nurse Durgiah, asserting a breach of contract claim against ReadyLink and an equitable indemnity claim against both defendants. A few days later, ReadyLink filed a separate lawsuit against Western, its corporate parent, and various sister hospitals. It claimed that starting in September 2012, Western and the other entities wrongfully stopped paying ReadyLink's invoices to offset the indemnity Western was seeking for the Stearns lawsuit.

The trial court consolidated the actions for purposes of trial and also granted a motion by ReadyLink to bifurcate the trial. The first phase was a bench trial

5

beginning in May 2017, which addressed ReadyLink's argument that the indemnity agreement was against public policy and invalid.[1] The court disagreed.

The second phase was a jury trial focusing on whether ReadyLink was obligated to indemnify Western. Due to scheduling issues, this phase did not commence until June 2018. Prior to trial, the court granted another motion by ReadyLink to bifurcate the second phase into two parts: (a) whether nurse Durgiah was negligent in caring for Stearns (part (a)); and (b) whether ReadyLink was negligent (part (b)). The trial court explained that ReadyLink's duty to indemnify would only be triggered if nurse Durgiah had been negligent. As such, "if the jury [found] that Durgiah was not negligent or that she did not cause Stearns any harm, then there would be no need to try the question of whether ReadyLink was negligent or owed any duty to indemnify [Western]." The trial court also deferred on deciding whether a third phase of trial would be necessary until after the second phase of trial was finished.[2]

Prior to and during part (a) of the trial, Western argued its settlement with Stearns entitled it to a rebuttable presumption that Western had injured Stearns and that the amount of its settlement with Stearns was reasonable. Western maintained the presumption shifted the burden of proof to ReadyLink to show Stearns had not been harmed and the settlement amount was unreasonable. The trial court ruled the presumption was not applicable to part (a), which was limited to nurse Durgiah's negligence. Due to the limited scope of part (a), the court also barred Western from mentioning the indemnity agreement and settlement.

---

[1] The first phase of trial also addressed ReadyLink's request to reform various contracts between ReadyLink and Western or Western's affiliates. The reformation issues are the subject of another consolidated appeal (G057280, G057382, G057581).

[2] The court and the parties later determined that Western's comparative negligence in caring for Stearns would also be tried in part (a), including whether Western negligently supervised nurse Durgiah.

*D. Testimony at Part (a) Two of Trial*

The testimony in part (a) showed that on January 7, 2011, ReadyLink sent nurse Durgiah to work a shift at Western beginning at 7:00 p.m., and ending the following day, January 8, at 7:30 a.m. After the O.R.I.F., Stearns arrived on nurse Durgiah's floor at 9:30 p.m. in stable condition. He complained of severe pain in his right leg, so nurse Durgiah gave him morphine, which had been prescribed by Dr. Hajj.

Stearns was still in severe pain at midnight. Nurse Durgiah's notes stated she would "page doctor for better pain management," but she could not recall whether she actually paged Dr. Hajj or anyone else. She gave Stearns two tablets of Vicodin at 2:05 a.m., per another prescription written by Dr. Hajj, and morphine at 3:40 a.m.[3] Stearns complained of pain again at 4:00 a.m. Nurse Durgiah's notes reflect that she paged Dr. Hajj around this time regarding Stearns' pain, but he had not responded. She could not recall whether she tried paging him again, whether he eventually answered the initial page, or whether she reported Stearns' condition to the charge nurse. But by 6:45 a.m., Stearns' pain had been 'somewhat relieved,' and he appeared to be comfortable.

Nurse Charito Mendoza assumed control of Stearns' care at 7:30 a.m., on January 8. Stearns was sleeping when she took over the shift and was quiet until 8:20 a.m., when he complained of pain and requested medication. Nurse Mendoza gave him morphine, which reduced his pain level from severe to mild. Stearns stopped complaining about the pain and went back to sleep.

Stearns next called nurse Mendoza at 10:10 a.m., complaining of severe pain. Nurse Mendoza gave him Vicodin, but it failed to alleviate his pain. Stearns then mentioned he had history of compartment syndrome and thought he might be suffering from it. Nurse Mendoza called Dr. Lane. He conducted a pressure test on Stearns and

---

[3] Nurse Durgiah was not the only nurse caring for Stearns that night. At least one other nurse employed by Western also cared for him and also gave him medication. The other nurse did not testify at trial.

found elevated pressures in his right leg. Dr. Lane conducted a fasciotomy at 1:00 p.m., that day, to relieve the pressure. A fasciotomy is a surgical procedure in which the surgeon cuts the fascia, the protective layer covering the muscle. It releases elevated pressures in muscle compartments and is also used to determine whether there is any muscle or nerve damage.

After conducting the fasciotomy, Dr. Lane did not believe Stearns had suffered any damage from compartment syndrome. Dr. Lane did not see any dead muscle, which he explained can be identified by its color. Instead, Stearns' muscle looked healthy. There was also no evidence that any of the muscle had lacked good blood flow. Nor did Dr. Lane believe Stearns had suffered any nerve damage.

Stearns was discharged on January 28, 2011. Dr. Lane testified he did not see any compromises with motor function or any nerve dysfunction in Stearns' right leg when he was discharged. Dr. Lane saw Stearns a few times after his discharge and saw no signs of nerve damage. It is unclear from the record how many times Dr. Lane saw Stearns and when those visits occurred.

Stearns missed a few follow-up appointments with Dr. Hajj after being discharged. He finally saw Dr. Hajj on March 30, 2011, nearly two months after his discharge. Stearns had no complaints at the appointment. The wound looked healed, and an x-ray of the tibia showed the fracture was also healing well. Dr. Hajj saw no evidence of damage to Stearns' muscle tissue. He recommended Stearns take physical therapy and come back for a follow-up appointment in eight weeks. Stearns did not return, and Dr. Hajj never saw him again. Dr. Hajj was unsure if Stearns attended physical therapy.[4]

---

[4] There was evidence in the record that Stearns missed at least a few physical therapy appointments. Medical records show he missed all his scheduled appointments after July 27, 2011. Stearns was eventually discharged from physical therapy on September 28, 2011, due to his failure to show up for treatment. However, it does not appear these medical records were shown to the jury.

*E. Expert Testimony at Trial*

Dr. Jacob Tauber provided expert testimony for Western at trial. He has been deposed over 1,000 times in his career. As of trial, he had not published anything since 1997, had not taken a trauma call "for many years," had not performed an O.R.I.F. in over four years, and had last performed a fasciotomy "years ago." Out of the thousands of surgeries he had done in his career, he had seen compartment syndrome 20 to 30 times.

Dr. Tauber performed a 30-minute independent examination of Stearns in September 2012, over 18 months after his hospitalization at Western. He observed Stearns had a limp, decreased feeling in his right foot, fixed contractures in his toes, and atrophied muscle in his right leg. Dr. Tauber conducted a second examination of Stearns in March 2017, over six years after the hospitalization, and fraud, Stearns physical condition to be roughly the same as the first exam.

At trial, Dr. Tauber opined that Stearns had compartment syndrome that began between 10:00 p.m., on January 7 and 1:00 a.m., on January 8. The opinion arose from Dr. Tauber's belief that Stearns began experiencing "disproportionate pain" around this time. In particular, Dr. Tauber observed Stearns was given morphine at around 10:00 p.m., which did not reduce his pain. Dr. Tauber further testified muscle death occurs four to six hours following the onset of compartment syndrome. As such, much of the permanent damage Stearns suffered occurred by 7:00 a.m., on January 8, when nurse Durgiah was finishing her shift. Dr. Tauber also stated Stearns' muscle would not have necessarily changed color by the time Dr. Lane performed the fasciotomy because "sometimes it takes more time for the tissue to declare itself." Even without a color change there could be "death on the microscopic or the cellular basis."

ReadyLink offered Dr. Michael Gillman in rebuttal to Dr. Tauber. Prior to his testimony, Western objected that Dr. Gillman's opinions went beyond the scope of rebuttal and should be excluded. The trial court found that Dr. Gillman's testimony

9

would not be unduly prejudicial to Western.  Thus, it concluded that Dr. Gillman could not only offer rebuttal testimony, but could provide his own independent opinions.  Dr. Gillman disagreed with Dr. Tauber's opinion that Stearns began suffering from compartment syndrome between 10:00 p.m., on January 7 and 1:00 a.m., on January 8.  Dr. Gillman stated that if Stearns had compartment syndrome at that time, his muscle would have looked dark purple or black when Dr. Lane performed the fasciotomy.

*F.  Judgment*

After each side presented its case, the jury was instructed that to find nurse Durgiah negligent, Western had to prove (1) "Daniel Stearns was harmed"; (2) nurse "Durgiah was negligent in the nursing care she rendered"; and (3) nurse "Durgiah's nursing negligence was a substantial factor in causing Daniel Stearns' harm." The jury returned a verdict one court day later, finding 11-to-one that nurse Durgiah had not been negligent.  This finding obviated the need for the jury to answer any other question on the verdict form, as well as the need for part (b) of trial.

Following the jury verdict in part (a), the trial court moved to phase three of the trial, which addressed whether ReadyLink had breached its contractual duty to defend Western under *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541.  If so, Western would be entitled to reimbursement of the attorney fees and costs it incurred defending the Stearns lawsuit.  Following trial, the jury found ReadyLink had not breached its duty to defend, denying Western recovery of its fees and costs.

After all phases of trial were complete, judgment was entered in favor of ReadyLink and against Western in August 2018, which Western now appeals.  It asserts two main arguments on appeal.  First, the trial court incorrectly denied it the benefit of a rebuttable presumption that Stearns suffered harm during part (a).  Second, the court erred by allowing Dr. Gillman to testify outside the scope of rebuttal.  ReadyLink filed a cross-appeal, arguing the indemnification agreement is invalid as a matter of law.

10

II

DISCUSSION

A. *Validity of the Indemnity Agreement*

We begin with ReadyLink's contention that the indemnity agreement is invalid. Its argument is based on language from the California Code of Regulations. The relevant portion states that "[i]f a hospital does not employ a qualified professional person to render a specific service to be provided by the hospital, there shall be arrangements for such a service through a written agreement with an outside resource . . . . The agreement shall specify that the hospital retains professional and administrative responsibility for the services rendered." (Cal. Code Regs., tit. 22, § 70713.) This regulation is reflected in paragraph 24 of the contract, which states "[t]he parties hereby agree that [Western] will retain professional and administrative responsibility for Services rendered under this Agreement." Based on this regulation and contract provision, ReadyLink appears to argue Western must assume all professional liability for the onsite conduct of ReadyLink's temporary nurses, including tort liability. It claims Western cannot delegate tort liability back to ReadyLink and that doing so violates the nondelegable duties doctrine. (Citing *Vargas v. FMI, Inc.* (2015) 233 Cal.App.4th 638 (*Vargas*).) We disagree and find the doctrine does not apply here.

"The nondelegable duties doctrine . . . 'prevents a party that owes a duty to others from evading responsibility by claiming to have delegated that duty to an independent contractor hired to do the necessary work.'" (*Vargas*, *supra*, 233 Cal.App.4th at p. 649.) "The doctrine is an exception to the common law rule that 'a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work.' [Citation.] . . . '[T]he party charged with a nondelegable duty is "held liable for the negligence of his [or her] agent, whether his [or her] agent was an employee or an independent contractor.""" (*Serrano v. Aerotek, Inc.* (2018) 21 Cal.App.5th 773, 782.)

11

The purpose of the nondelegable duties doctrine is to prevent a party from unfairly avoiding liability. The doctrine safeguards the public by ensuring that persons cannot insulate themselves from liability by contracting operations that involve an unreasonable risk of harm to independent contractors. (*Vargas*, *supra*, 233 Cal.App.4th at p. 649; *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1087.) Among other things, the doctrine "'protect[s] the public from financially irresponsible contractors, and . . . strengthen[s] safety regulations.'" (*Vargas*, at p. 650.) It also "prevent[s] . . . future harm to the public by giving the licensees strong incentives to ensure that their [workers'] conduct conforms to law." (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 296-297.)

Applying the doctrine here would not serve these purposes. In fact, it would likely decrease public safety by reducing the incentive for temporary staffing agencies to carefully scrutinize the nurses they employ. Namely, by encouraging the agencies to shift the burden of vetting nurses from themselves to medical providers. This would be an illogical outcome, especially given the temporary nature of each nurse's assignment. The staffing agency is best situated to aggregate and assess the performance of its nurse employees at their various assignments. A medical provider seeking temporary assistance likely does not have the time or ability to thoroughly review each temporary nurse provided. They must be able to rely on the agencies to send qualified nurses. As such, the burden must be on the staffing agencies to ensure their nurses are competent when they are hired and throughout their employment. Otherwise, a staffing agency could hire a patently unqualified nurse, send that nurse to hospitals to care for vulnerable patients, and then disclaim any liability if that nurse injured a patient. This would be an unacceptable result and a perversion of the nondelegable duty doctrine.

To clarify, we do not mean to suggest a staffing agency will always be solely liable for the conduct of its temporary nurses. There may be comparative fault between the hospital and staffing agency or instances where the hospital is completely

12

liable for the acts of a temporary nurse. We only reject ReadyLink's argument that a staffing agency can never be liable for the onsite acts of its temporary nurses under the nondelegable duties doctrine.

## B. Settlement Presumption

Western makes several arguments that distill to a single issue: did the trial court err by denying Western the benefit of a rebuttable presumption that its settlement with Stearns presumptively established Western harmed Stearns? Western contends the court misunderstood the applicable law and denied it the benefit of this presumption. This improper application of the law, Western maintains, led the court to give incorrect jury instructions on the burden of proof and to exclude evidence of the settlement from part (a) of the trial. We find that even if the trial court erred by not applying the presumption, the error was not so prejudicial as to warrant reversal.

### 1. Standard of review

Generally, this appeal asks us to determine whether the trial court misinterpreted the law when it failed to apply the presumption. Issues of law are reviewed de novo. (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089-1090.) Other legal principles also guide our analysis. Among them, the trial court's judgment is presumed to be correct on appeal. The reviewing court presumes the trial court followed applicable law, and all intendments and presumptions are made in favor of the judgment where the record is silent. The judgment will be affirmed if it is correct on any theory, regardless of the court's reasoning. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) The burden is on Western to show reversible error. (*Donohue v. AMN Services, LLC* (2018) 29 Cal.App.5th 1068, 1076.) "Only when an error has resulted in a miscarriage of justice will it be deemed to be prejudicial so as to require reversal. [Citation.] A miscarriage of justice exists if, in

13

the absence of the error, a result more favorable to plaintiffs probably would have occurred." (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 114.)

### 2. *Application of the presumption*

Generally, an indemnitor "is bound, on request of the [indemnitee], to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity." (Civ. Code, § 2778, subd. (4).) "If, after request, the [indemnitor] neglects to defend the [indemnitee], a recovery against the latter . . . is conclusive in his favor against the former." (Civ. Code, § 2778, subd. (5).) "Recovery," though, "refers only to a recovery by judgment against the indemnitee" after trial. (*Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1495-1496 (*Peter Culley*).) This limitation is based on the principle that a judgment is conclusive to the matters adjudged. Thus, if an indemnitee is adjudged to be liable to an injured party after trial, that finding is binding in a subsequent action by the indemnitee against the indemnitor. (*Ibid.*)

A different rule applies when the indemnitee settles prior to trial. In this scenario, nothing has been adjudged. Thus, the indemnitee does not get the benefit of the conclusive presumption in Civil Code section 2778, subdivision (5). (*Peter Culley*, *supra*, 10 Cal.App.4th at pp. 1495-1496.) Rather, the settling indemnitee must establish three elements to prove it is owed indemnity from the indemnitor in a subsequent lawsuit: (1) the indemnitee's claim is within the scope of the indemnity agreement; (2) the indemnitee was liable to the injured party in the underlying suit; and (3) the amount of the liability. (*First American Title Ins. Co. v. Spanish Inn, Inc.* (2015) 239 Cal.App.4th 598, 603-604.)

If the indemnitor wrongfully refused to provide a defense in the underlying lawsuit, the settling indemnitee is entitled to a rebuttable presumption that affects the

14

second and third elements.[5] (*Peter Culley*, *supra*, 10 Cal.App.4th at pp. 1493-1494, 1497.) The presumption shifts the burden from the indemnitee to the indemnitor to show, by a preponderance of the evidence, that the indemnitee was not liable to the injured party and that the amount of the settlement was not reasonable. (See, e.g., *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1282-1283; *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 529-530.) To clarify, the presumption does not apply to the first element, i.e., whether the indemnitee's claim is covered by the indemnity agreement. (*Heppler*, at pp. 1281-1282; *Peter Culley*, at p. 1494.)

Here, part (a) focused solely on the first element of Western's indemnity claim. The trial court found that if nurse Durgiah was not negligent, then Western's indemnity claim was not covered by the contract. This ruling has not been challenged on appeal. As such, the rebuttable presumption seems to be irrelevant to part (a) since it only affects the second and third elements of an indemnity claim. But Western contends the presumption must be applied here since one of the issues raised in litigating nurse Durgiah's negligence was whether Western was liable for Stearns' harm. Among other things, ReadyLink argued during part (a) that Western did not cause Stearns' injuries. In particular, it asserted Stearns did not suffer long-term damage from compartment syndrome. Likewise, the jury was instructed that to establish nurse Durgiah's negligence, Western had to prove "[t]hat Daniel Stearns was harmed." As Western interprets the presumption, had it been correctly applied in part (a), it would have been presumed that Western caused Stearns to suffer permanent injury from compartment syndrome. And the burden would have been on ReadyLink to prove otherwise by a preponderance of the evidence.

Western contends the trial court improperly deprived it of this rebuttable presumption by waiting until phase three to try the duty to defend issue, after the jury had

---

[5] The presumption is derived from insurance law principles rather than statute. (*Peter Culley*, *supra*, 10 Cal.App.4th at pp. 1493-1494, 1497.)

15

already determined that ReadyLink did not owe indemnity in part (a). It claims the court should have first determined whether ReadyLink breached its duty to defend and then allowed the jury to consider the indemnity issue.[6] (Citing Code Civ. Proc., § 592; *Centex Homes v. R-Help Construction Co., Inc.*, *supra*, 32 Cal.App.5th at p. 1236.) If the court had done so, Western believes it would have found ReadyLink had breached its duty to defend, which would have entitled Western to the above presumption in part (a). Western does not explain in great detail why the trial court would have ruled differently than the jury on the duty to defend issue. It only broadly states Stearns' complaint and interrogatory responses showed sufficient facts to implicate nurse Durgiah's negligence, triggering ReadyLink's duty to defend.

Regardless, we need not determine whether the trial court erred by trying the indemnity issue first, whether ReadyLink breached its duty to defend, or even whether Western's proposed interpretation or application of the presumption is correct (Western has not cited any case law in which the presumption has been applied to establish an indemnitor's negligence). These questions are inconsequential if no miscarriage of justice resulted from the perceived error, which we conclude is the case here. It is unlikely Western would have received a more favorable result had the court applied the rebuttable presumption as requested. (*Osborn v. Mission Ready Mix*, *supra*, 224 Cal.App.3d at p. 114.)

---

[6] An indemnitor's duty to defend is typically broader than its duty to indemnify. The duty to defend arises "before the litigation has determined whether indemnity is actually owed. [Citation.] Claims on which a duty to defend is owed include those which at the time of tender allege facts that would give rise to a duty of indemnity." (*Centex Homes v. R-Help Construction Co., Inc.* (2019) 32 Cal.App.5th 1230, 1236.) Western does not independently assert the trial court erred by allowing the jury to try the duty to defend issue. It only raised this issue in its reply brief as part of its argument that the trial court incorrectly denied it the presumption. In fact, its opening brief entirely omitted phase three of the trial and did not explain how the duty to defend issue was resolved.

As set forth above, it is undisputed nurse Durgiah had to be negligent to trigger ReadyLink's indemnification obligation. This required a showing that (1) Stearns had been harmed; (2) nurse Durgiah's conduct fell below the applicable standard of care; and (3) nurse Durgiah's negligence was a substantial factor in causing Stearns' harm. Western's interpretation of the presumption would have shifted the burden on the first prong to ReadyLink to show Stearns had not been harmed by compartment syndrome. Western would still have had the burden on the second and third prongs.

Western primarily believes nurse Durgiah was negligent because she appeared not to follow Dr. Hajj's order to perform neurovascular checks on Stearns every two hours to check for proper blood circulation. She performed one check on Stearns around 10:00 p.m., and everything appeared normal. But her notes did not record any subsequent neurovascular checks, and she could not recall at trial whether she performed any.[7] She also allegedly failed to contact a doctor or charge nurse when Stearns continued to complain of pain after being given morphine. Western asserts that if nurse Durgiah had not failed to take these actions, Stearns' compartment syndrome would have been detected earlier and he would not have been permanently injured by it. However, considerable evidence was presented at trial that Stearns was not harmed by compartment syndrome, and, even if he were, the syndrome did not begin until after nurse Durgiah's shift ended. In other words, the evidence shows nothing she did delayed the discovery of compartment syndrome.

Every witness agreed the pain caused by compartment syndrome is excruciating. Western's expert, Dr. Tauber, described it as "disproportionate pain." He explained a warning sign of compartment syndrome is pain continuing after medication.

---

[7] Nurse Durgiah testified that just because something was not recorded in her notes, that does not mean it did not happen. If she performed a test that did not have significant results, she might not have recorded it. In her ordinary practice, she would have documented a significant result had it occurred.

17

Similarly, expert witness Carol Marietta, a nurse practitioner, stated the pain from compartment syndrome is "unrelenting and doesn't respond to medications." Dr. Gillman testified the pain is "untouchable," meaning that "no amount of medicine relieves the pain." He further stated that if Stearns been suffering from compartment syndrome during nurse Durgiah's shift, he would have been in excruciating pain throughout the night that could not be controlled with medication. Dr. Hajj similarly testified that a patient with compartment syndrome cannot sleep due to the pain.

However, Stearns' pain was still responding to medication during nurse Durgiah's shift and he appeared to be comfortable before her shift ended. In fact, Stearns was sleeping when nurse Mendoza took over his care. And his pain again responded to medication given by nurse Mendoza at 8:20 a.m., which allowed Stearns to sleep again. It was not until after 10:00 a.m., hours after nurse Durgiah's shift had ended, that Stearns' pain stopped responding to medication.

Indeed, the jury appeared to find it significant that Stearns was sleeping when nurse Mendoza took over his care. During deliberation, the jury only requested to have one portion of testimony read back to them: nurse Mendoza's testimony that Stearns was asleep when she began her shift. Mere hours later, it issued a verdict finding nurse Durgiah had not been negligent. Moreover, the jury reached its 11-to-one decision only one court day after receiving jury instructions, indicating it was not a close decision.

In addition, Dr. Lane saw no evidence of permanent muscle or nerve damage from compartment syndrome during the fasciotomy. Nor did he see any signs of permanent damage in any of Stearns' follow-up visits. Likewise, Dr. Hajj did not see any evidence of permanent damage at Stearns' follow-up appointment two months after he was discharged. And Stearns did not have any complaints at this appointment.

In contrast, the primary evidence that Stearns suffered any permanent damage from compartment syndrome during nurse Durgiah's shift came from Dr. Tauber. Notably, he did not examine Stearns until 18 months after the

18

hospitalization. He never saw pictures of Stearns' muscle. Nor did he take a biopsy or examine the muscle under a microscope. But based on Stearns' medical records, he believed Stearns was in disproportionate pain around 10:00 p.m., and that he began suffering from compartment syndrome shortly thereafter. In explaining why Dr. Lane saw no evidence of damage during the fasciotomy, Dr. Tauber stated that the muscle tissue would not have necessarily changed color by that time because the death could have occurred on a microscopic level.

But Dr. Tauber's opinion is severely undercut by the evidence above, which shows that Stearns' pain began responding to medication prior to the end of nurse Durgiah's shift, allowing him to sleep. His pain again responded to medication provided by nurse Mendoza. Dr. Tauber does not appear to explain how Stearns was able to respond to pain medication or sleep if he had compartment syndrome during nurse Durgiah's shift. Rather, even he found it surprising that Stearns was sleeping when nurse Mendoza took over his care. Nor does Dr. Tauber explain why Dr. Lane and Dr. Hajj saw no evidence of permanent damage months after Stearns' was discharged.

Given the amount and weight of the above evidence, it likely made little difference which party had the burden of proving that Stearns did or did not suffer harm. And even if changing the burden would have caused the jury to find that Stearns' injuries were caused by compartment syndrome, it would have had no effect on the other two negligence prongs. Western still would have needed to show that nurse Durgiah did not meet her standard of care and that this was a substantial factor in causing Stearns' injuries. Yet, as discussed above, there was ample evidence nurse Durgiah was not a factor in causing Stearns' alleged harms because his compartment syndrome did not begin until after her shift ended. Nor is it clear from the record that nurse Durgiah failed to meet her standard of care. Since applying the presumption was unlikely to have changed the jury's verdict, we find no reversible error.

19

To the extent Western separately claims it was erroneously barred from presenting evidence of the settlement during part (a), we find no miscarriage of justice occurred for the reasons stated above. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.) Allowing evidence regarding the settlement would not have affected the jury's verdict regarding nurse Durgiah's negligence.

Similarly, we reject Western's claim it was prejudiced by the trial court's failure to include the presumption in its jury instructions. A slightly different standard applies to this claim: "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581, fn. omitted.)

As to the first factor, based on our analysis above, we find it weighs heavily in favor of ReadyLink. As to the second, third, and fourth factors, the jury instructions stated the burden was on Western to show Stearns was harmed, and ReadyLink's counsel also argued that the burden was on Western. Thus, assuming Western was entitled to the presumption, the jury was misled into thinking Western had the burden of proving Stearns' harm. But as explained above, very little prejudice, if any, resulted from placing the burden on Western rather than ReadyLink. We find the balance of factors weighs in favor of ReadyLink and Western did not suffer any prejudice by the alleged errors in the jury instructions.

## C. *Expert Testimony*

Western argues the trial court erred by allowing Dr. Gillman to provide independent opinions, since he had not been designated by ReadyLink as an expert. While Western concedes Dr. Gillman could provide rebuttal testimony, they contend his testimony went beyond the scope of impeachment. We find no error.

20

"Error in the admission of evidence is reversible only if there is a reasonable probability -- meaning a possibility that is more than abstract -- that the appellant would have obtained a more favorable result had the evidence been excluded. [Citations.]  A '"reasonable"' probability under this test is one sufficient to undermine the reviewing court's confidence in the outcome."  (*Pina v. County of Los Angeles* (2019) 38 Cal.App.5th 531, 545.)  Even if the portions of Dr. Gillman's testimony to which Western objected were inadmissible, none of it undermines our confidence in the jury's verdict.  Most of it was cumulative of the testimony of other witnesses or did not cause significant prejudice for other reasons.

To start, Dr. Tauber's initial report documented that Stearns did not have "foot drop," which refers to difficulty lifting the front part of the foot due to nerve damage.  Dr. Gillman stated the absence of foot drop ruled out that Stearns had suffered serious complications from compartment syndrome.  Western argues this testimony was improper.  But this testimony was cumulative of Dr. Lane, who also testified that he would have expected to see foot drop if Stearns suffered any damage from compartment syndrome.

Next, Western asserts Dr. Gillman should not have been allowed to testify that Stearns' leg injuries were normal for someone who had surgery for a tibial fracture.  This opinion does not appear to have been significantly prejudicial.  Dr. Gillman's testimony was similar in nature to Dr. Hajj's testimony that when he saw Stearns on March 30, 2011, Stearns had no complaints, the wound looked healed, the fracture was healing well, and there was no evidence of damage to Stearns' muscle tissue.  In other words, Stearns was making a standard recovery for someone who had undergone an O.R.I.F.

Western also contends the trial court should have excluded Dr. Gillman's testimony that if Stearns had compartment syndrome at midnight on January 8, 2011, he would have had dead muscle that looked dark purple or black when Dr. Lane performed

21

the fasciotomy 13 hours later.  Again, this testimony was cumulative of Dr. Lane's testimony that dead muscle tissue is a different color and that he saw no evidence of dead muscle caused by compartment syndrome during the fasciotomy.  Thus, it was not significantly prejudicial.

During trial, Dr. Lane testified that he performed multiple surgical debridements on Stearns after the fasciotomy.[8]  Western objects to Dr. Gillman's testimony that these debridements were routine.  This contradicted Dr. Tauber testimony that the debridements removed dead muscle tissue "result[ing from] compartment syndrome which was not diagnosed soon enough."  But Dr. Lane also testified that debridements are always performed after major surgery and are not evidence of damage caused by compartment syndrome.

Western further claims it was improper for Dr. Gillman to testify that Dr. Tauber should have ordered an electromyography test (EMG) during his September 2012 examination if he felt Stearns had serious neurological problems.  Western asserts Dr. Tauber was conducting an independent medical examination at the time, so he was precluded from recommending an EMG.  We find this evidence was not prejudicial since Dr. Tauber testified twice that he was not permitted to recommend an EMG for Stearns.  These statements remedied any prejudice caused by Dr. Gillman's testimony.

Finally, as discussed in part II.B, *ante*, Dr. Tauber's opinion regarding the onset of Stearns' compartment syndrome was controverted by the testimony of Dr. Hajj, Dr. Lane, nurse practitioner Marietta, nurse Mendoza, and nurse Durgiah.  Even without the testimony of Dr. Gillman, there was considerable evidence Stearns did not suffer permanent damage from compartment syndrome during nurse Durgiah's shift.  As such, to the extent Dr. Gillman's testimony was improper, it does not undermine our confidence in the jury's verdict and does not constitute reversible error.

---

[8]  A debridement is the cleaning of a wound to remove small pieces of dead tissue.

### III

### DISPOSITION

The judgment is affirmed.  ReadyLink is entitled to its costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.