Filed 10/12/22 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| TOMMY RAY McCULLAR et al., | C093295 |
| Plaintiffs and Appellants, | (Super. Ct. No. SC20160049) |
| v. | ORDER MODIFYING OPINION |
| SMC CONTRACTING, INC., | [NO CHANGE IN JUDGMENT] |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Michael J. McLaughlin, Judge.  Affirmed.

Law Office of Mark R. Swartz, Mark R. Swartz; and C. Athena Roussos for Plaintiffs and Appellants.

Ford, Walker, Haggerty & Behar and B. Eric Nelson for Defendant and Respondent.

THE COURT:

It is ordered that the opinion filed herein on August 29, 2022, and certified for publication on September 13, 2022, be modified as follows:

1.      On page 17, after the first partial paragraph that ends with "we apply similar logic to reject McCullar's negligence claim here," the following paragraphs and footnote are

1

inserted.  This footnote shall be footnote 1, which will require renumbering of all subsequent footnotes.

In a petition for rehearing, McCullar maintains that *Tverberg II* is analogous and *Gonzalez* is distinguishable for several reasons.  He first suggests *Gonzalez* is distinguishable because there, the hirer's failure to act led to the creation of a workplace hazard; but here, the hirer's affirmative act led to the creation of a workplace hazard.  But in our view, whether a hirer's failure to act or affirmative act creates a workplace hazard, the rule is the same:  "Once an independent contractor becomes aware of a hazard on the premises, 'the landowner/hirer delegates the responsibility of employee safety to the contractor' and 'a hirer has no duty to act to protect the employee when the contractor fails in that task . . . .' [Citation.]" (*Gonzalez*, *supra*, 12 Cal.5th at p. 44.)  The *Gonzalez* court, in describing this rule, never suggested a more searching analysis into the precise cause of the hazard—whether from a failure to act or an affirmative act— was necessary.  Nor did the *Sandoval* court when it said, "A hirer might be responsible for the presence of a hazard and even convey an expectation that the contractor perform its work without eliminating that hazard altogether, and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit." (*Sandoval*, *supra*, 12 Cal.5th at p. 276.)  A contrary rule that premises liability on whether the hirer's failure to act or affirmative act created the workplace hazard would add an inappropriate qualification to these holdings.

A contrary rule, moreover, would also undermine one of the principles underlying the *Privette* doctrine.  As the *Sandoval* court explained, the *Privette* doctrine is "rooted" in part on "society's need for clear rules about who's responsible for avoiding harms to workers when contractors are hired." (*Sandoval*, *supra*, 12 Cal.5th at p. 264.)  But "society's need for clear rules about who's responsible" would be undermined if it hinged responsibility on the precise cause of the hazard.  A contractor, for instance, should not second-guess its responsibility to address a workplace hazard simply because it believes the hirer's affirmative act, rather than the hirer's passive act, led to the hazard's existence.  It should instead, once aware of the hazard, simply adhere to the same clear rule in both circumstances—take whatever precautions are necessary to protect its workers from the hazard.  This is, in our reading, the clear teaching of our Supreme Court's decisions in *Gonzalez* and earlier cases.  (See *Gonzalez*, *supra*, 12 Cal.5th at p. 44 ["once the contractor becomes aware of a concealed hazard's existence, it becomes the contractor's responsibility to take whatever precautions are necessary to protect itself and its workers from the hazard"].)

McCullar also contends *Gonzalez* is distinguishable for another reason.  He argues that when he asked SMC about the ice—asking, " '[W]hat are we going to do about the ice situation?' "—he conveyed the message that "he could not safely

2

perform the work of laying pipes . . . and that he had no way of clearing the ice." He then suggests the plaintiff in *Gonzalez* did not convey a similar type of message when he informed the landowner's housekeeper "that the roof was in a dangerous condition and needed to be repaired" (*Gonzalez*, *supra*, 12 Cal.5th at p. 40), since he afterward continued to work on the roof without further raising the issue. But in our view, McCullar attributes too much to his question about the ice. Although McCullar fairly conveyed the message that he preferred SMC to deal with the ice, we find it unreasonable to say that he also conveyed the message that "he could not safely perform the work of laying pipes . . . and that he had no way of clearing the ice."[1]

[1] In his petition for rehearing, McCullar also contends we omitted key facts, including, among other facts, SMC's authority to resolve disputes over safety issues and SMC's president's statement that he expected his superintendent to stop any unsafe practices, to remove ice onsite, and to stop work in icy areas. But in his initial briefing, McCullar never contended these facts showed that SMC negligently exercised its retained authority over the contracted work in a manner that affirmatively contributed to his injuries. Nor, in any event, do these facts support that conclusion. Although SMC might have had authority to resolve safety disputes, to remove ice, and to stop work, that only shows that SMC could have exercised authority over the work, not that it actually did.

There is no change in the judgment. Appellant's petition for rehearing is denied.


FOR THE COURT:



  /s/
HOCH, Acting P. J.



  /s/
RENNER, J.



  /s/
EARL, J.


3

Filed 8/29/22 Certified for Publication 9/13/22 (order attached) (unmodified opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| TOMMY RAY McCULLAR et al., | C093295 |
| Plaintiffs and Appellants, | (Super. Ct. No. SC20160049) |
| v. | |
| SMC CONTRACTING, INC., | |
| Defendant and Respondent. | |

Under California law, a strong presumption exists that a hirer of an independent contractor delegates to the contractor all responsibility for workplace safety. This is known as the *Privette* doctrine based on the California Supreme Court decision that first announced this principle. (See generally *Privette v. Superior* Court (1993) 5 Cal.4th 689.)

In this case, SMC Contracting, Inc. (SMC) hired Tyco Simplex Grinnell, Inc. (Tyco) to install an automatic fire sprinkler system for a development in South Lake Tahoe. On one date during installation, a Tyco employee, Tommy Ray McCullar, arrived

1

at work and found the floor covered in ice. While trying to use a ladder on the ice, McCullar slipped and suffered injuries.

McCullar later sued SMC based on these events. But the trial court, relying on the *Privette* doctrine, granted summary judgment in SMC's favor. Challenging this decision on appeal, McCullar's contends the *Privette* doctrine does not protect SMC because SMC retained control over Tyco's work and negligently exercised this control in a way that affirmatively contributed to his injuries. That is so, he reasons, because SMC caused the ice to form on the floor and then told him to go back to work after he notified it about the ice. Based on the *Privette* doctrine, and because McCullar fails to raise a triable issue of material fact, we affirm.

BACKGROUND

I.      *Factual Background*

"Because this case comes before us after the trial court's grant of summary judgment, we apply these well-established rules:  ' " '[W]e take the facts from the record that was before the trial court when it ruled on that motion,' " ' and we ' " ' " 'review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " ' " ' [Citation.]  We also ' " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " ' [Citation.]" (*Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 521 (*Tverberg I*).)

SMC was the general contractor for a project known as the Chateau at the Village in South Lake Tahoe, California—a region SMC's owner described as part of "the snow country" with occasionally icy conditions. Tyco was one of its subcontractors and was charged with installing an automatic fire sprinkler system for the project. Under the parties' agreement, Tyco agreed to "immediately correct any and all unsafe acts or conditions that are brought to its attention" and to "comply with all specific safety

2

requirements promulgated by any governmental authority, including without limitation, the requirements of the applicable state and federal Occupational Safety Health Act . . . ." Tyco also agreed to "conform to the safety policy of [SMC]." SMC's safety policy stated, among other things, that "[s]ubcontractor supervisory personnel will review each work area prior to commencing work" and eliminate "[a]ny [s]afety hazards . . . prior to commencing work." The policy added that subcontractors must provide a safety orientation for their employees, which must include the following instruction: "Don't work unsafely or in unsafe environment. Tell foreman."

McCullar worked for Tyco on the project. On one date during the sprinkler installation, he arrived at work to find the floor covered in ice. McCullar attributed the ice to SMC's work the night before. SMC had ordered heaters turned on overnight inside one of the project buildings to help dry a fireproofing coating. According to McCullar, the heaters melted the snow on the roof, the melted snow dripped onto the floor through openings in the roof where air conditioning units were to be installed, and the water on the floor then froze into ice overnight when the temperature fell below freezing.

On seeing the ice, McCullar asked SMC's superintendent what are "we . . . going to do about this ice issue"? But rather than answer the question, the superintendent said that SMC "ha[d] to have the heaters on" to dry the fireproofing coating on the building's steel beams. McCullar responded, " 'Well, that's fine, but what are we going to do about the ice situation?' " "And at that point," according to McCullar, the superintendent "told me to go back to work and he turned around and walked off." Shortly before talking to SMC's superintendent, McCullar also asked Tyco's field superintendent "what he was going to do about the issue we have with safety of all the ice on the floor." But Tyco's field superintendent said only, " 'What can I tell you, Tom. Get the job done.' "

McCullar afterward began to work on the ice using a ladder. Sometime later, he fell after the ladder slid on the ice and suffered a shoulder injury that eventually required surgery.

3

II.    *Procedural Background*

McCullar and his wife (collectively, McCullar) sued SMC, alleging five causes of action.  First, McCullar alleged that SMC was liable on a negligence theory because it "negligently allowed ice to exist on the interior floor of the" project and violated its duty to provide "a safe work place for all of its employees and [subcontractors]."  Second, he alleged that SMC was liable on a negligence per se theory because, in violation of a work safety regulation, it failed to maintain work floors in a safe, nonslippery condition.  Third, based on the same work safety regulation, he alleged that SMC violated a nondelegable duty to maintain work floors in a safe condition.  Fourth, he alleged that SMC violated its legal obligation to maintain a safe workplace.  And lastly, raising a loss of consortium claim, he alleged that SMC deprived his wife "of his services, love, affection, comfort, care and society."

SMC later moved for summary judgment.  It argued that SMC delegated its duty to ensure a safe workplace to Tyco and so McCullar needed to look to Tyco, not SMC, for his recovery.  It reasoned that under the California Supreme Court's decisions in *Privette* and later cases, a hirer of an independent contractor implicitly delegates to the contractor any tort law duty it owes to the contractor's employees to ensure the safety of the workplace.  It added that the parties' contract in this case explicitly delegated to Tyco the duty to provide a safe workplace.

McCullar opposed the motion.  Although he acknowledged that a hirer of a contractor could delegate to the contractor the responsibility to ensure a safe workplace, he contended a hirer could still be liable to a contractor's employee if its own negligence affirmatively contributed to the employee's injuries.  He then argued that SMC affirmatively contributed to his injuries when it caused ice to form on the floor and then instructed him to return to work without solving the problem.  Considering these facts, McCullar contended "SMC negligently exercised its retained control over project safety

4

and affirmatively contributed to [his] injuries." He further contended SMC failed to comply with a workplace safety regulation covering slippery surfaces at worksites.

The trial court granted SMC's motion. Under *Privette* and similar cases, the court wrote, a presumption exists that the hirer of an independent contractor delegates to the contractor its duty to provide a safe workplace for the contractor's employees. Considering this presumption and SMC's offered evidence, the court found that SMC made a prima facie showing that McCullar's claims failed as a matter of law. The court also found that McCullar failed to rebut this presumption. Although the court acknowledged two exceptions to this presumption, including one where the hirer's exercise of its retained control affirmatively contributes to an employee's injury, it found McCullar "offer[ed] insufficient evidence to raise a triable issue of fact that SMC contractually or by conduct retained control over safety conditions." It added that even assuming SMC retained control over safety conditions, McCullar offered "[n]o evidence . . . tending to show that SMC actually exercised control over McCullar's worksite." Lastly, turning to McCullar's claim that SMC failed to comply with a regulation covering slippery surfaces at worksites, the court found McCullar also failed to meet his "burden of showing a triable issue of fact exists that SMC owed McCullar any statutory duties that were retained and not delegated to Tyco." The court afterward entered judgment in SMC's favor.

McCullar timely appealed.

DISCUSSION

I.      *Background Law*

"The *Privette* doctrine holds that a hirer generally delegates to an independent contractor all responsibility for workplace safety and is not liable for injuries sustained by the contractor or its workers while on the job." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 40 (*Gonzalez*).) Our Supreme Court has found this doctrine appropriate because a hirer typically has no right to control the manner of a contractor's work and hires a

5

contractor precisely because of the contractor's greater ability to perform the work safely and successfully. (*Id.* at pp. 45-46.) The court has also found this doctrine promotes workplace safety through "clear rules about who's responsible for avoiding harms to workers when contractors are hired." (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 264 (*Sandoval*).) Because of these types of considerations, the court has "endorsed a 'strong policy' of presuming that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor." (*Id.* at p. 270.)

But although this presumption in favor of a hirer's nonliability is strong, it is not irrebuttable. In the years following *Privette*, the court has "identified two limited circumstances in which the presumption is overcome." (*Gonzalez*, *supra*, 12 Cal.5th at p. 38.) First, in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, (*Hooker*), the court "held that a hirer may be liable when it retains control over any part of the independent contractor's work and negligently exercises that retained control in a manner that affirmatively contributes to the worker's injury." (*Gonzalez*, at p. 38.) Second, in *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*), the court "held that a landowner who hires an independent contractor may be liable if the landowner knew, or should have known, of a concealed hazard on the property that the contractor did not know of and could not have reasonably discovered, and the landowner failed to warn the contractor of the hazard." (*Gonzalez*, at p. 38.)

Our focus in this case is on the first of these two exceptions, often called the *Hooker* exception to *Privette*. The exception includes "three key concepts: retained control, actual exercise, and affirmative contribution." (*Sandoval*, *supra*, 12 Cal.5th at p. 274.) "A hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor." (*Ibid.*) Our Supreme Court has emphasized that "[a] hirer might be responsible for the presence of a hazard and even convey an expectation that the contractor perform its work without

eliminating that hazard altogether, and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit. [Citation.] In such instance, the hirer does not necessarily retain a sufficient degree of control over the contractor's manner of performing the contracted work to constitute 'retained control.' " (*Id.* at p. 276.)

"A hirer 'actually exercise[s]' its retained control over the contracted work when it involves itself in the contracted work 'such that the contractor is not entirely free to do the work in the contractor's own manner.' [Citations.] In other words, the hirer must exert some influence over the manner in which the contracted work is performed." (*Sandoval*, *supra*, 12 Cal.5th at p. 276.) "Unlike 'retained control,' which is satisfied where the hirer retains merely the *right* to become so involved, 'actual exercise' requires that the hirer in fact involve itself" (*ibid.*), "such as by directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; requesting the contractor to use the hirer's own defective equipment in performing the work; contractually prohibiting the contractor from implementing a necessary safety precaution; or reneging on a promise to remedy a known hazard" (*Gonzalez*, *supra*, 12 Cal.5th at p. 47; see also *Hooker*, *supra*, 27 Cal.4th at p. 209 [" 'The mere failure to exercise a power to compel the subcontractor to adopt safer procedures does not, without more, violate any duty owed to the plaintiff.' "]).

Lastly, " '[a]ffirmative contribution' means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury." (*Sandoval*, *supra*, 12 Cal.5th at p. 277.) A hirer's conduct satisfies the affirmative contribution requirement when "the hirer in some respect induced—not just failed to prevent—the contractor's injury-causing conduct." (*Ibid.*) "A hirer's conduct also satisfies the affirmative contribution requirement where the hirer's exercise of retained control contributes to the injury independently of the

7

contractor's contribution (if any) to the injury." (*Ibid.*) That would be true, for instance, if "the hirer promises to undertake a particular safety measure, [but] then . . . negligent[ly] fail[s] to do so." (*Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.)

The *Hooker* exception to *Privette* is triggered only when all three of these concepts—retained control, actual exercise, and affirmative contribution—are satisfied. Our Supreme Court in *Sandoval* summed up these three concepts this way: "A hirer's mere authority to prevent or correct a contractor's unsafe practices (retained control) does not, without more, limit the contractor's delegated control over the work. But to the extent that the hirer exerts influence over the contracted work such that the contractor is not entirely free to perform the work in the contractor's own manner (actual exercise), the hirer does limit the contractor's delegated control. Still, we impose a duty only where that limitation itself contributed to the worker's injury (affirmative contribution), rather than where that limitation incidentally created an opportunity for the hirer to prevent the contractor's injury-causing conduct." (*Sandoval*, *supra*, 12 Cal.5th at p. 278.)

The *Sandoval* court found that "[i]mposing this duty on the hirer where *Hooker*'s test is satisfied is consistent with the strong policy of delegation that undergirds the *Privette* doctrine." (*Sandoval*, *supra*, 12 Cal.5th at p. 278.) It added that "[i]mposing a duty on the hirer under these limited circumstances . . . furthers at least three of the major tort law goals underlying the policy of delegation [it] detailed in [its] past cases applying *Privette*." (*Id.* at p. 279.) "First, *Hooker*'s rule should tend to improve worksite safety, because it generally discourages hirer involvement in contracted work. This is preferable because we presume the contractor is best situated to prevent contract worker injury given its relative proximity to the work, superior expertise and resources, ability to internalize costs, and relationship with the workers. [Citations.] At the same time, the rule incentivizes the hirer to use reasonable care when the hirer does get involved." (*Ibid.*) "Second, the rule distributes liability equitably as between the hirer and the contractor. Where the hirer's contribution to an injury is merely derivative of the

8

contractor's, it seems unfair to subject the hirer to tort liability while workers' compensation shields the contractor—not so where the hirer induces or independently contributes to the injury." (*Ibid.*) "Finally, *Hooker*'s rule tends to strike an appropriate balance between victim compensation and socially undesirable hirer burdens, avoiding a tort scheme that might lead hirers to impose inappropriate safety requirements [citation] or avoid assigning dangerous jobs to those with the necessary expertise [citation]." (*Ibid.*)

      II.    *McCullar's Negligence Claim*

In this case, starting with his negligence claim and invoking the *Hooker* exception, McCullar contends triable issues of fact exist as to whether "SMC retained control over the work and exercised such control in a manner that affirmatively contributed to [his] injuries." He first argues SMC retained control over Tyco's work principally based on its authority to stop any unsafe practice, its responsibility to remove snow to allow access to the project, and its status as a general contractor. He then claims "SMC exercised its retained authority and affirmatively contributed to [his] injuries" in two ways: first, when it "ordered the heaters to be run all night, causing snow to melt through the roof and ice to form on the floor"; and second, when it told him to go back to work after he mentioned the ice, even though he "had no authority to alter the work area and had no way to get rid of the ice in his area." Although we accept, for purposes here, that SMC retained control over Tyco's work, we are not persuaded that SMC negligently exercised its retained authority in a manner that affirmatively contributed to McCullar's injuries.

We start with McCullar's argument concerning SMC's running of the heaters. Although we accept that SMC's conduct caused ice to form and required Tyco to take extra safety precautions to account for the ice, we conclude these facts are insufficient to show that SMC's exercise of its retained control affirmatively contributed to McCullar's injuries. As McCullar acknowledges, he was aware of the ice before he suffered his injuries. And as our Supreme Court has explained, "[o]nce an independent contractor

becomes aware of a hazard on the premises, 'the landowner/hirer delegates the responsibility of employee safety to the contractor' and 'a hirer has no duty to act to protect the employee when the contractor fails in that task . . . .' [Citation.]" (*Gonzalez*, *supra*, 12 Cal.5th at p. 45.) That is because the hirer generally has no right to control the manner of the contractor's work and "the law assumes that the independent contractor is typically better positioned to determine whether and how open and obvious safety hazards on the worksite might be addressed in performing the work." (*Id.* at p. 38; see also *Sandoval*, *supra*, 12 Cal.5th at p. 264 [the presumed delegation of responsibility "is rooted in hirers' reasons for employing contractors in the first place, and society's need for clear rules about who's responsible for avoiding harms to workers when contractors are hired"].)

This presumed delegation of responsibility, moreover, is not overcome simply because the hirer negligently created the hazardous condition. As our Supreme Court explained in *Sandoval*, "[a] hirer might be responsible for the presence of a hazard and even convey an expectation that the contractor perform its work without eliminating that hazard altogether, and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit." (*Sandoval*, *supra*, 12 Cal.5th at p. 276.) Consistent with this principle, even when the hirer of a contractor negligently creates a known workplace hazard, the court has concluded that the contractor still retains the responsibility for assessing whether its workers can perform their work safely. (See *Gonzalez*, *supra*, 12 Cal.5th at pp. 40, 54 [a contractor fell off a roof that was slippery because of the landowner's lack of maintenance; it was nonetheless still the contractor's duty, not the owner's duty, to assess whether he and his workers could perform their work safely "despite the existence of the known hazardous conditions on the roof"]; *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 594-595, 601 (*SeaBright*) [after an airline hired a contractor to maintain and repair its luggage conveyor, a contractor employee suffered an injury that would have been prevented had

the airline installed "certain safety guards [on the conveyor] required by applicable regulations"; it was nonetheless still the contractor's "duty to identify the absence of the safety guards . . . and to take reasonable steps to address that hazard"]; see also *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078, 1082, 1090 [a contractor's employee fell to his death from a building after attempting, unsuccessfully, to support his weight with a visibly inadequate roof anchor; even assuming the building owner failed to equip its commercial building with the roof anchors required by law, it nonetheless was not liable because it had delegated to the contractor "its duty to provide a safe workplace for [the contractor's] employees"].)

On facts like those here, then, it is the contractor's responsibility, not the hirer's responsibility, to take the necessary precautions to protect its employees from a known workplace hazard. And should the contractor fail to take the necessary precautions, as Tyco did in this case when it simply told McCullar to " '[g]et the job done' " despite the ice, its employees cannot fault the hirer for the contractor's own failure. (See *Kinsman*, *supra*, 37 Cal.4th at p. 674 ["Because the landowner/hirer delegates the responsibility of employee safety to the contractor, the teaching of the *Privette* line of cases is that a hirer has no duty to act to protect the employee when the contractor fails in that task and therefore no liability; such liability would essentially be derivative and vicarious."]; *Tverberg I*, *supra*, 49 Cal.4th at p. 522 ["Having assumed responsibility for workplace safety, an independent contractor may not hold a hiring party vicariously liable for injuries resulting from the contractor's own failure to effectively guard against risks inherent in the contracted work." (Italics omitted.)].)

McCullar's claim that SMC directed him to go back to work after he disclosed the ice does not alter this conclusion. According to McCullar, he asked SMC's superintendent what are "we . . . going to do about this ice issue"? But rather than answer the question, the superintendent said that SMC "ha[d] to have the heaters on" to dry the fireproofing coating on the structure's steel beams. Returning to his question,

11

McCullar said, " 'Well, that's fine, but what are we going to do about the ice situation?' " "And at that point," according to McCullar, the superintendent "told me to go back to work and he turned around and walked off." McCullar contends these facts show "he was directed to go back to work and do his job," even though he "had no authority to alter the work area and had no way to get rid of the ice in his area."

But SMC's general direction "to go back to work" did not interfere with or otherwise impact McCullar's decisions on how to safely perform his work. SMC did not, for example, direct McCullar to place a ladder on the ice and then attempt to climb it. Nor did SMC prohibit McCullar from removing the ice, as McCullar suggests. McCullar suggests he could not remove the ice because, according to the testimony of SMC's owner, a subcontractor could not "alter the state of [a] work site, outside of what is their work," unless they first checked with SMC. But no reasonable person, in our view, would understand spilled water and resulting ice to be part of "the state of [a] work site." McCullar, for his part, never even alleges that he held this view. The parties' agreement, moreover, specifically authorized (and in fact, required) Tyco to "immediately correct any and all unsafe acts or conditions that are brought to its attention." It also required Tyco to comply with SMC's safety policy, which obligated "[s]ubcontractor supervisory personnel [to] review each work area prior to commencing work" and eliminate "[a]ny [s]afety hazards . . . prior to commencing work."

Contrary to McCullar's claims, then, we conclude that Tyco not only had the authority to remove the ice, whether by chipping the ice, melting the ice, or through some other means; it also, as discussed, had the responsibility to take the necessary precautions to protect its employees from any hazard posed by the ice. And although Tyco did not exercise this responsibility to prevent McCullar's injury, McCullar cannot hold SMC responsible for Tyco's own failure. (See *Sandoval*, *supra*, 12 Cal.5th at p. 275 ["a hirer's authority over the contracted work amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the

12

contracted work in the contractor's own manner"].)  Nor can he hold SMC liable on the theory that SMC knew of the unsafe condition and so should have remedied it. (*Gonzalez*, *supra*, 12 Cal.5th at p. 46 [the *Hooker* exception to *Privette* is not met solely because a "hirer knows of the danger and has the authority and ability to remedy it"].)

Our Supreme Court's recent decision in *Gonzalez* is consistent with our conclusion.  In that case, which was also resolved on summary judgment, a landowner hired a company to clean a skylight on the landowner's roof on an ongoing basis. (*Gonzalez*, *supra*, 12 Cal.5th at pp. 39-40.)  On one occasion, the company's owner, Gonzalez, informed the landowner's housekeeper "that the roof was in a dangerous condition and needed to be repaired."  But the landowner, it appears, did nothing in response.  (*Id.* at p. 40.)  Several months later, "at the direction of [the landowner's] housekeeper, Gonzalez went up on to the roof to tell his employees to use less water while cleaning the skylight because water was leaking into the house.  While Gonzalez was walking . . . [on] the roof on his way back to the ladder, he slipped and fell to the ground, sustaining serious injuries."  (*Id.* at p. 39.)  Gonzalez later sued the landowner, alleging, as relevant here, that he should "be held liable under the well-established *Hooker* exception to *Privette*."  (*Id.* at p. 55.)

But our Supreme Court rejected the claim.  Although Gonzalez contended the landowner's "lack of maintenance caused the roof to have a very slippery surface," and although he testified that he informed the landowner's housekeeper about the roof's poor condition, the court nonetheless concluded that Gonzalez, not the landowner, had a duty "to assess whether he and his workers could [perform their work] safely despite the existence of the known hazardous conditions on the roof."  (*Gonzalez*, *supra*, 12 Cal.5th at pp. 40, 54.)  The court added that "[i]t would be contrary to the principles underlying *Privette* to hold that [the landowner] also had a duty to determine whether the work could be performed safely absent remediation of a known hazard."  (*Id.* at p. 54.)  And although the landowner's "housekeeper directed Gonzalez to go on to the roof on the day of the

13

accident to tell his workers to use less water in cleaning the skylight," the court concluded this too did not make the landowner potentially liable. (*Id.* at p. 56.) It explained that "the general direction to 'go on to the roof' did not interfere with or otherwise impact Gonzalez's decisions regarding how to safely perform the work or provide a safe workplace for his employees." (*Ibid.*) It reasoned that the "housekeeper did not, for example, direct Gonzalez to walk [on a particular area on the roof] or otherwise influence his decisions regarding whether and how he might safely cross over the roof in order to reach his workers." (*Ibid.*) Under these facts, the court concluded, the landowner was "not liable under our well-established precedent because he did not exercise any retained control over any part of Gonzalez's work in a manner that affirmatively contributed to Gonzalez's injury." (*Id.* at p. 57.) Similar principles doom McCullar's negligence claim here.

Although McCullar attempts to portray *Gonzalez* in a light more favorable to his position, his effort falls short. At the close of its opinion, the court wrote: "We do not decide whether there may be situations, not presented here, in which a hirer's response to a contractor's notification that the work cannot be performed safely due to hazardous conditions on the worksite might give rise to liability. For example, we do not decide whether a hirer's conduct that unduly coerces or pressures a contractor to continue the work even after being notified that the work could not be performed safely due to a premises hazard would fall under the *Hooker* exception to *Privette*." (*Gonzalez, supra*, 12 Cal.5th at p. 56, italics omitted.) Focusing on this language, McCullar claims "[t]he present case involves the situation expressly left open in *Gonzale*[*z*]—where a hirer has unduly coerced or pressured a contractor to continue to work in unsafe conditions, after being notified that work cannot be performed safely due to a hazard on the premises—in this case, a hazard created by the hirer."

But McCullar's reliance on *Gonzalez* is misplaced. Although, as McCullar notes, the *Gonzalez* court said "a hirer's response to a contractor's notification that the work

14

cannot be performed safely due to hazardous conditions on the worksite might give rise to liability" (*Gonzalez, supra*, 12 Cal.5th at p. 56, italics omitted), McCullar does not claim that he informed SMC "that the work c[ould not] be performed safely due to hazardous conditions on the worksite." He instead asserts that he sought direction on how to deal with the hazardous condition, asking, " '[W]hat are we going to do about the ice situation?' " SMC declined to provide this advice, telling him only to "go back to work." Again, SMC did not instruct McCullar to attempt to use a ladder on the ice. Nor did it prohibit McCullar from attempting to remove the ice, attempting to cover it to create a nonslippery surface, or attempting to work in an area without ice. It instead simply left him to his own devices in dealing with the ice, which is insufficient, as a matter of law, to establish liability under our Supreme Court's precedents. (See *Sandoval, supra*, 12 Cal.5th at p. 281 [hirer did not exercise retained control when contractor "remained entirely free to implement (or not) [a number of safety] precautions in its own manner, issues over which [hirer] exerted no influence"].)

Although McCullar also claims the Court of Appeal's reasoning in *Tverberg v. Fillner Constr.* (2012) 202 Cal.App.4th 1439 (*Tverberg II*) favors his position, this claim too falls short. That case involved a "project requir[ing] construction of a metal canopy over some fuel-pumping units." (*Id.* at p. 1442.) One contractor, Tverberg, led a crew charged with constructing the canopy, and another contractor was charged with constructing eight "concrete posts intended to prevent vehicles from colliding with the fuel dispensers." (*Ibid.*) Before Tverberg's first day, the other contractor dug eight large holes for the concrete posts, which "were next to the area where Tverberg was to erect the metal canopy." (*Id.* at pp. 1442-1443.) Tverberg asked the general contractor for the project "to cover the holes with large metal plates that were onsite, but [the general contractor] said that [it] did not have the necessary equipment to do so that day." (*Id.* at p. 1443.) The next day, Tververg repeated his request, but the general contractor failed to

15

act on it. "A short while later, as Tverberg walked from his truck toward the canopy, he fell into a . . . hole and was injured." (*Ibid.*)

Tverberg sued the general contractor, alleging, as relevant here, that it was liable under the *Hooker* exception to *Privette*. (*Tverberg II*, *supra*, 202 Cal.App.4th at pp. 1447-1448.) Although the trial court later dismissed his claims on summary judgment, the Court of Appeal reversed, concluding three triable issues of fact precluded summary judgment. First, it found "that by ordering these holes to be created and requiring Tverberg to conduct unrelated work near them, [the general contractor's] conduct may have constituted a negligent exercise of its retained control in a manner that could have made an affirmative contribution to Tverberg's injury." (*Id.* at p. 1448.) Second, because the general contractor determined "that there was no need to cover or barricade the . . . holes," the court found "an inference that [the general contractor] affirmatively assumed the responsibility for the safety of the workers near the . . . holes, and discharged that responsibility in a negligent manner, resulting in injury." (*Ibid.*) And third, because the general contractor indicated it intended to cover the holes when it had the necessary equipment, the court found "a reasonable jury [could] infer that [the general contractor] agreed to cover the holes and then failed to meet this responsibility." (*Ibid.*)

According to McCullar, *Tverberg II* is "analogous." Focusing on the first of the court's three reasons for finding a triable issue of fact, McCullar contends *Tverberg II* is similar because SMC created a hazardous condition and then, after learning of it, nonetheless told him to go back to work without providing direction on how to address the hazard. But to the extent the *Tverberg II* court believed the *Hooker* exception could apply on these types of facts, we decline to follow it. The *Tverberg II* court, again, found the general contractor might be liable under *Hooker* because it created a workplace hazard (namely, holes in the ground) and then "requir[ed] Tverberg to conduct unrelated work near [the hazard]." (*Tverberg II*, *supra*, 202 Cal.App.4th at p. 1448.) But in

16

*Gonzalez*, our Supreme Court reached the opposite conclusion on facts that were not too different. Similar to the general contractor in *Tverberg II*, the hirer in *Gonzalez* was responsible for the presence of a workplace hazard (namely, a slippery roof) and asked the contractor to perform unrelated work on the roof. (*Gonzalez, supra*, 12 Cal.5th at pp. 39-40.) Yet the court still, at the summary judgment stage, found the hirer was not liable when the contractor fell from the roof and suffered injuries. (*Id.* at pp. 56-57.) Following our Supreme Court's reasoning, rather than the Court of Appeal's reasoning in *Tverberg II*, we apply similar logic to reject McCullar's negligence claim here.

In sum, under our Supreme Court's *Privette* line of cases, we conclude SMC delegated all responsibility for workplace safety to Tyco. This delegation included the responsibility to ensure that Tyco's workers would be able to perform their work safely despite the known presence of ice that increased the risk of falling. And this delegation included this responsibility even though SMC "might [have been] responsible for the presence of [the] hazard." (*Sandoval, supra*, 12 Cal.5th at p. 276 ["A hirer might be responsible for the presence of a hazard . . . and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit."].) Under the undisputed material facts in this case, we conclude that SMC is not liable under our Supreme Court's "well-established precedent because [it] did not exercise any retained control over any part of [Tyco's] work in a manner that affirmatively contributed to [McCullar's] injury." (*Gonzalez, supra*, 12 Cal.5th at p. 57.)

III.    *McCullar's Negligence Per Se and Loss of Consortium Claims*

McCullar's remaining claims on appeal fail for similar reasons. He first claims the trial court wrongly found his negligence per se claim failed as a matter of law. In his view, "SMC may be held liable to McCullar for negligence per se based on its violation of OSHA Rule 3273"—a rule that requires slippery floors to "be protected against slipping by using mats, grates, cleats, or other methods which provide equivalent protection." (Cal. Code Regs., tit. 8, § 3273, subd. (a); hereafter section 3273.) Although

17

McCullar acknowledges that, in hiring an independent contractor, a hirer implicitly delegates to the contractor "any tort law duty [it] owes to the contractor's employees to comply with applicable statutory or regulatory safety requirements" (*SeaBright*, *supra*, 52 Cal.4th at p. 594, fn. omitted), he contends no such delegation occurred here.  That is because, he argues, "evidence shows that SMC retained control over certain aspects of the Project including overall safety of the workplace, snow and ice removal, coordination with other contractors . . . and ordering the heaters to be run causing ice to form on the floor."

We reject his claim.  As factual support for his argument, McCullar cites to "Section II.B.," which is the very section in which he makes his claim.  But at most, the relevant record citations in "Section II.B." show only that SMC's conduct contributed to the formation of the ice.  That alone, however, does not show that SMC retained a tort law duty to comply with section 3273.  As discussed above, SMC presumptively delegated to Tyco any tort law duty it owed to Tyco's employees to ensure the safety of the workplace.

Nothing in section 3273 requires a different result, as our Supreme Court's decision in *SeaBright* demonstrates.  In that case, an airline owned and operated a luggage conveyor that "lacked certain safety guards required by applicable regulations." (*SeaBright*, *supra*, 52 Cal.4th at p. 594.)  It hired a contractor to maintain and repair the conveyor and, while inspecting the conveyor, one of the contractor's employees suffered an injury that would have been prevented had the conveyor had the required safety guards.  (*Ibid.*)  The employee later sued the airline, alleging, similar to McCullar, "that Cal-OSHA[1] imposed on [the airline] a duty of care" that the airline violated.  (*Id.* at p. 596.)  But the court rejected the claim.  It reasoned that the airline "presumptively

---

[1]    The California Occupational Safety and Health Act of 1973.  (Lab. Code, § 6300 et seq.)

delegated to [the contractor] any tort law duty of care the airline had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of [the contractor's] employees," "includ[ing] a duty to identify the absence of the safety guards required by Cal-OSHA regulations and to take reasonable steps to address that hazard." (*Id.* at p. 601.) The same reasoning applies here: SMC "delegated to [Tyco] any tort law duty of care [it] had under Cal-OSHA and its regulations to ensure workplace safety for the benefit of [Tyco's] employee," including any duty to take precautions to address slippery surfaces. (*Ibid.*; see also *Tverberg II*, *supra*, 202 Cal.App.4th at p. 1445 [holding that the general contractor "delegated its obligation to comply with Cal-OSHA workplace regulations to Tverberg," even though the general contractor's conduct created the dangerous condition that led to Tverberg's injury].)

Apart from focusing on SMC's role in causing the ice, McCullar also, as noted, contends SMC retained a tort law duty to comply with section 3273 for other reasons—namely, because "evidence shows that SMC retained control over certain aspects of the Project including overall safety of the workplace, snow and ice removal, [and] coordination with other contractors . . . ." But as mentioned, McCullar fails to supply citations to the record supporting these remaining contentions, which is reason enough to reject his argument. (Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1406 [courts "may disregard any claims when no reference [to the record] is furnished"].) We nonetheless acknowledge, as McCullar alleges, that the parties' contract required SMC to remove snow to the extent necessary "to allow access to the project." And although we accept that a failure to remove snow "to allow access to the project" could lead to the formation of ice in some circumstances, McCullar does not allege that SMC's failure to remove snow "to allow access to the project" led to the formation of the ice in this case.

19

McCullar next suggests the trial court wrongly rejected his negligence per se claim because "SMC's failure to remove the ice and its order to [him] to continue with his work violated Labor Code section 6400." But he raises this argument in a section purporting, according to its heading, to deal only with SMC's alleged "violation of OSHA Rule 3273." McCullar needed to raise his distinct argument based on Labor Code section 6400 "under a separate heading or subheading summarizing the point," as required under California Rules of Court, rule 8.204(a)(1)(B). Because he failed to do so, we conclude he forfeited this argument. (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4.) In any event, as discussed already, we conclude SMC delegated to Tyco "any tort law duty [it] owe[d] to [Tyco's] employees to comply with applicable statutory or regulatory safety requirements." (*SeaBright*, *supra*, 52 Cal.4th at p. 594, fn. omitted.)

Lastly, McCullar contends we should reverse the trial court's ruling on his wife's loss of consortium cause of action if we reverse the trial court's ruling on his negligence and negligence per se causes of action. But because we conclude McCullar failed to show reversal appropriate for his negligence causes of action, we have no ground for reversing his wife's derivative cause of action for loss of consortium.

## DISPOSITION

The judgment is affirmed.  SMC is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

                    /s/_____
                    HOCH, Acting P. J.

We concur:

/s/_____
RENNER, J.

/s/_____
EARL, J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| TOMMY RAY McCULLAR et al., | C093295 |
| Plaintiffs and Appellants, | (Super. Ct. No. SC20160049) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| SMC CONTRACTING INCORPORATED, | [NO CHANGE IN JUDGMENT] |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Michael J. McLaughlin, Judge.  Affirmed.

Law Office of Mark R. Swartz, Mark R. Swartz; and C. Athena Roussos for Plaintiffs and Appellants.

Ford, Walker, Haggerty & Behar and B. Eric Nelson for Defendant and Respondent.

THE COURT:

The opinion in the above-entitled matter filed on August 29, 2022, was not certified for publication in the Official Reports.  For good cause it now appears that the

opinion should be published in the Official Reports and it is so ordered.

FOR THE COURT:


  /s/
HOCH, Acting P. J.


  /s/
RENNER, J.


  /s/
EARL, J.

2